IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ERNEST KEISTER,         :         No. 4:13-cv-00118
        :
        Plaintiff,         :
        :
        v.         :         (Judge Brann)
        :
PPL CORPORATION,         :
INTERNATIONAL BROTHERHOOD    :
OF ELECTRICAL WORKERS,         :
LOCAL 1600,         :
        :
        Defendants.         :

**MEMORANDUM**

October 6, 2015

This decision evaluates dual Motions for Summary Judgment filed by

Defendants PPL Corporation and the International Brotherhood of Electrical

Workers Local 1600 Union, as well as a Motion for Rule 11 Sanctions filed solely

by PPL. Because the Court finds that there are no genuine issues of material fact

precluding summary judgment on any of Plaintiff's claims, Defendants' Motions

for Summary Judgment are both granted in full. In addition, PPL's Motion for Rule

11 Sanctions is held in abeyance pending a hearing before this Court.

## I. BACKGROUND

### A. Plaintiff's Employment and Bargaining History with Defendants

Plaintiff Ernest Keister was born on December 23, 1947. ECF No. 27 at 5.

He has resided at 11 Laurel Park Lane, Millmont, Union County, Pennsylvania uninterrupted for at least the past twenty years. Id. at 1; ECF No. 40, Ex. 3 at 1; ECF No. 50 at 1. Plaintiff first became an employee of Defendant PPL in 1978. [1] ECF No. 27 at 2; ECF No. 40 at 1. Plaintiff worked for PPL for more than thirty-four (34) years. ECF No. 27 at 2. He began his employment with PPL as a handyman working in operations at its Sunbury, Northumberland County, Pennsylvania plant. ECF No. 27 at 2; ECF No. 42 at 7; ECF No. 4, Ex. 4 at 8. After working in that capacity, Plaintiff bid on and was awarded a technical assistant position in PPL's Susquehanna Steam Electric Station, located adjacent to the Susquehanna River in Berwick, Luzerne County, Pennsylvania. ECF No. 40, Ex. 4 at 8. At all relevant times, Plaintiff was also a member of Defendant International Brotherhood of Electrical Workers Local 1600 ("Union"). Id.

During his employment with PPL, Plaintiff held the titles of "Technical Assistant Susquehanna," "Senior Technical Assistant Susquehanna," and "Nuclear Information Services Technician." ECF No. 27 at 2. Plaintiff was a contact for computer services at PPL since December of 1981, during which time he designed, implemented, and maintained the IBM Mainframe, the Token Ring, and the Ethernet. Id. Plaintiff also managed the initial installations and the technological

---

[1] According to PPL, Plaintiff erroneously listed his official employer as PPL Corporation or PPL Services Corporation. PPL states that "[a]t all relevant times, Plaintiff's actual employer was PPL Susquehanna, LLC (since renamed 'Susquehanna Nuclear, LLC')." ECF No. 40 at 1 n.1.

changes that occurred in the various buildings over the years. Id. Plaintiff's Second Amended Complaint further outlines a number of managerial tasks he would routinely perform at the Susquehanna plant, all of which Plaintiff suggests fell outside the scope of his official job description. Id. at 3. Thus, Plaintiff's core allegations are that "[his] job description and his pay grade do not reflect his actual job duties, and he is not being paid for what he is actually doing," and that "Defendants has [sic] not been serious in its [sic] efforts to remedy the pay disparity and job classification issue." Id. at 3–4.

### B. The Collective Bargaining Agreement, Plaintiff's Reevaluation Requests, and Plaintiff's Communication with the Union

Plaintiff, as a Union member, was party to a Collective Bargaining Agreement ("CBA") with PPL. ECF 40, Ex. 3 at 5; ECF 50 at 30. That CBA includes a specific process to request a job reevaluation and the recourse available to employees who are dissatisfied with the results of such a request. ECF 40, Ex. 3 at 5; ECF 50 at 30. In this regard, if a job reevaluation request is not approved, a bargaining unit employee, such as Plaintiff, may appeal the decision. If the Union and PPL still disagree, any bargaining unit employee could proceed by initiating the grievance process. ECF 40, Ex. 3 at 5; ECF 50 at 30.

Specifically, Article VI, Section 1 of the CBA provides in pertinent part that:

The Company will prepare new or eliminate old job titles and descriptions or otherwise revise or modify them when necessary to meet changed conditions. Requests for new jobs and requests for re-

evaluation for existing jobs will be handled in accordance with
<u>Exhibit N</u>.

ECF No. 40, Ex. 4 at 66 (underlining in original).  Under the heading "Existing
Jobs," Exhibit N provides in pertinent part that:

1. A request to re-evaluate an existing job description may be
   initiated by an incumbent employee or appropriate supervisor.

   . . .

5. If the request is not approved by the Company, Bargaining Unit
   employees may appeal the decision to the IBEW Local 1600
   office.

6. Disagreements between the Company and Local 1600 regarding
   whether to submit an existing position for re-evaluation shall be
   resolved through the grievance procedure.

ECF No. 40, Ex. 4 at 67–68.

On or about June 13, 1986, Plaintiff requested a job reevaluation due to his

work with the computers and related infrastructure. ECF 40, Ex. 3 at 4; ECF 50 at

30. Plaintiff was thirty-nine (39) years-old at the time he made that request. ECF

40, Ex. 3 at 4; ECF 50 at 30. PPL took no action on Plaintiff's request, and

Plaintiff never filed a formal complaint, charge, or grievance with the Union

contesting this determination. ECF 40, Ex. 3 at 4; ECF 50 at 30.

Plaintiff subsequently submitted  another request for job reevaluation on or

about July 31, 2000. ECF 40, Ex. 3 at 5; ECF 50 at 30. After that request, Plaintiff

was provided with a new job title, a new pay rate, and back pay. ECF No. 40, Ex. 4

at 24. The July 2000 request was Plaintiff's last formal job reevaluation request

until the May 2011 request at issue in this dispute. Id. at 24–26.[2]

On May 4, 2011, Plaintiff contacted Richard John Sopko, Chief Steward for

the Union at the Susquehanna plant. ECF No. 50 at 39. Sopko told Plaintiff:

> The union has no interest in giving up a [bargaining unit] position. If
> the company wants to create a new management job and put you in it,
> that can be at their discretion. . . . If your intent is to turn your current
> position into a management job, I can't help you with that. Sorry.

Id.

Sopko, in a follow-up email sent two minutes after the initial

correspondence, wrote:

> The union will still support a job re-eval to determine if the position is
> paid correctly. You know I believe it is too low.

Id.

Plaintiff then submitted a job reevaluation request to PPL on or about May

4, 2011. ECF No. 40, Ex. 3 at 9; ECF No 50 at 33. PPL took no action on the May

2011 request. ECF No. 40, Ex. 3 at 9; ECF No 50 at 33.

On March 20, 2012 Plaintiff received a similar response during a phone

conversation with Daniel Zerbe, a Business Representative for the Union. ECF No.

50 at 33. During that conversation, Zerbe told Plaintiff that:

> [H]e should stop his efforts and that Local 1600 would not support

---

[2] The record indicates that there was potentially one additional request sometime between 2000 and 2011, though the date was never established, and Plaintiff admits he never filed any formal grievance in relation to it. ECF No. 40, Ex. 4 at 26. Because Plaintiff's deposition testimony is inconclusive on the issue and even indicates the date on the document may have been missing, id., the Court focuses on the May 2011 request, which is the only one at issue here.

moving his job out of the bargaining unit.

Id. at 34, 41–45. Zerbe explained that he also told Plaintiff:

> I told him he should file a Request for Job Evaluation/Reevaluation.
> . . . I told him to speak to Sopko to file a grievance.

Id. at 44.

Both Sopko and Zerbe pointed Plaintiff toward the appropriate channels for initiating a formal grievance, but Plaintiff never filed a grievance or requested that a grievance be filed on his behalf in regard to his May 4, 2011 job reevaluation request. ECF No. 40, Ex. 3 at 10; ECF No 50 at 33.

### C. Procedural Posture

Plaintiff filed his United States Equal Employment Opportunity Commission ("EEOC") Charge alleging age discrimination on June 28, 2011, ECF No. 40, Ex. 4 at 44. On August 30, 2012, the EEOC mailed Plaintiff a "Dismissal and Notice of Rights," stating that any subsequent lawsuit Plaintiff sought to initiate "must be filed WITHIN 90 DAYS of [his] receipt of this notice." ECF No. 40, Ex. 4 at 49 (capitalization and underlining in original). That right-to-sue letter was addressed to "Ernest Keister" at "11 Laurel Park Lane, Millmont, PA 17845." Id. According to Plaintiff, he had previously received "multiple correspondences from the EEOC, which were all addressed to him" at the same record address used in the right-to-sue letter. ECF No. 40, Ex. 3 at 1–2; ECF No. 50 at 1. According to Plaintiff, the right-to-sue letter was erroneously addressed to his Counsel's old office. ECF No.

40, Ex. 4 at 50. Plaintiff's Counsel did not contact the EEOC regarding his non-receipt of the letter until December 21, 2012. Id.

On January 17, 2013, Plaintiff filed a Complaint (ECF No. 1) setting forth two claims of discrimination on the basis of age—one under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. ("ADEA") and a second under the Pennsylvania Human Relations Act, 43 P.S. §§ 951 et seq. ("PHRA")—as well as a third claim alleging a violation of § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) ("LMRA"). Plaintiff asserted all three claims against both Defendants.

On March 14, 2013, PPL moved to dismiss the Complaint. ECF No. 8. Plaintiff responded by filing an Amended Complaint on April 15, 2013. ECF No. 14. Plaintiff's Amended Complaint contained the same three claims, each alleged against both defendants, but included additional averments. On May 1, 2013, PPL moved to dismiss the Amended Complaint. ECF No. 16. The Union moved to dismiss the Amended Complaint on June 11, 2013. ECF No. 20.

On June 24, 2013, Plaintiff moved for leave to file a Second Amended Complaint. ECF No. 21, which this Court granted on June 13, 2014. ECF No. 25. The Second Amended Complaint included the same three causes of action, but named PPL as the only defendant on the ADEA and PHRA claims. ECF No. 27. Plaintiff maintained that both Defendants violated § 301 of the LMRA. Id. The

Second Amended Complaint also supplemented various averments in support of Plaintiff's theories. Id.

Further clarification of the exact evidence on which Plaintiff's claims are based was largely stymied by certain failures in Plaintiff's filings. These failures included: his incomplete response to certain of PPL's key Undisputed Facts;[3] his decision not to address any of the Union's Undisputed Facts and instead merely attach a copy of his responses to PPL's Undisputed Facts when answering the Union's motion;[4] and a seeming disconnect at several important junctures between the allegations in Plaintiff's Second Amended Complaint and the actual evidence adduced by Plaintiff during discovery[5]—all conduct that Plaintiff will answer for

---

[3] See ECF No. 50 at 34 ("[T]he balance of Defendant's SUMF Paragraph 71 violates the proscription set forth in F.R.C.P. No. 56 (c) (2) (B) [sic] by including statements of opinion not supported by the record and therefore not admissible at trial."). See also ECF No. 50 at 30. For starters, the Court observes that Fed. R. Civ. P. 56(c)(2)(B) does not exist. However, even if it did, this Court would certainly not exclude a Plaintiff's prime evidentiary justification for his claims as inadmissible "opinion." Further, this Court cautions that refusing to supply such critical backing for one's claim may warrant a negative inference that such evidence is nonexistent. As PPL has observed, "Plaintiff cannot refuse to admit sworn statements and then conjure facts in a futile effort to create a triable issue." ECF No. 51 at 4.

[4] As a consequence and in accordance with Middle District of Pennsylvania Local Rule 56.1, the Court deems as admitted any facts submitted by the Union not explicitly controverted by Plaintiff's response to PPL's Undisputed Facts.

[5] See PPL's Br. in Supp. of its Mot. for Rule 11 Sanctions, ECF No. 39 at 22 n.2 "By way of example, the Second Amended Complaint filed by Attorney Russo alleges that "PPL has hired younger employees into similar positions that were doing the same amount of work." Second Amended Complaint, ¶ 31. Plaintiff not only testified that he is the "only person" who performs his position but that he cannot name a single significantly younger employee who was treated more favorably. Exhibit A, pp. 62, 81, and 112." The Court observes a similar inconsistency between Plaintiff's Second Amended Complaint and his subsequent deposition testimony with regard to Plaintiff's LMRA claim and the particular justification on which it was based. The Court reminds the Parties that Fed. R. Civ. P. 11(b) mandates that an attorney

in a subsequent Rule 11 Sanctions hearing before this Court.

Both Defendants have filed Motions for Summary Judgment, ECF Nos. 36, 40, and PPL has individually filed a Motion for Rule 11 Sanctions against Plaintiff. ECF No. 38. Because the Court agrees with Defendants that there are no genuine disputes of material fact precluding summary judgment at this juncture, Defendants' Motions for Summary Judgment are both granted in full. As noted above, PPL's Motion for Rule 11 Sanctions is held in abeyance pending a hearing before the Court.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts that could alter the outcome are 'material facts,' see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)." Clark v. Modern Grp. Ltd., 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.). "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case." Id. "A plaintiff, on the other hand, must point to admissible

---

conduct "an inquiry reasonable under the circumstances" into the law and facts prior to certification and filing in Federal Court.

evidence that would be sufficient to show all elements of a <u>prima facie</u> case under applicable substantive law." <u>Id.</u> "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." <u>Celotex Corp.</u>, 477 U.S. at 323–24.

"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." <u>Liberty Lobby, Inc.</u>, 477 U.S. at 252. Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." <u>Id.</u> "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Id.</u> "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" <u>Id.</u> (quoting <u>Schuylkill & Dauphin Imp. Co. v. Munson</u>, 81 U.S. 442, 447 (1871)).

"[A] party seeking summary judgment always bears the initial responsibility

of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323 (internal quotations omitted). "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id.

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, Inc., 477 U.S. at 250. For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"When opposing summary judgment, the non-movant may not rest upon

mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" <u>Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 233 (3d Cir.2003) (Weis, J.). Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). On motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Liberty Lobby, Inc.</u>, 477 U.S. at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Id.</u> "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted." <u>Id.</u> at 249–50 (internal citations omitted).

## III. ANALYSIS

### A. Defendants' Motions for Summary Judgment are granted as to Plaintiff's LMRA claim.

"It has long been established that an individual employee may bring suit against his employer for breach of a collective bargaining agreement." <u>DelCostello</u>

v. Int'l Bhd. of Teamsters, 462 U.S. 151, 163 (1983). Generally, "an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement." Id. However, when the employee's union "acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation," the default exhaustion requirement "works an unacceptable injustice." Id. at 164.

When both the employer and the union are allegedly at fault, an employee may initiate a "hybrid" claim. Id. at 165. These "hybrid" claims "comprise two causes of action": the employer's breach of a collective bargaining agreement under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and the union's breach of its duty of fair representation under the National Labor Relations Act, 29 U.S.C. § 151 et seq. DelCostello, 462 U.S. at 164. "Such a hybrid action really alleges that the process of collective bargaining has broken down." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 593 (3d Cir. 2005) (quoting United Steelworkers v. Crown Cork & Seal Co., 32 F.3d 53, 58 (3d Cir.1994)).

In such a "hybrid" action, "the two claims are inextricably interdependent." DelCostello, 462 U.S. at 164. For instance, for a "hybrid" action whose underlying claim is wrongful discharge, "[t]o prevail against either the company or the Union, . . . [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by

the Union." Id. at 194 (quoting United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 66–67 (1983)). "The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both." DelCostello, 462 U.S. at 165. Such an action "is thus not a straightforward breach of contract suit under § 301, . . . but a hybrid § 301/fair representation claim, amounting to a direct challenge to the private settlement of disputes under [the collective-bargaining agreement]." Id. (internal citations and quotations omitted). In a hybrid § 301 claim, a plaintiff "must prove that the employer breached the collective bargaining agreement in order to prevail on the breach of duty of fair representation claim against the union and vice versa." Podobnik, 409 F.3d at 594 (quoting Felice v. Sever, 985 F.2d 1221, 1226 (3d Cir.1993)).

In this case, Plaintiff appears to base his LMRA claim on two purported omissions by Defendants: failure to convert his bargaining unit position to a managerial one (Plaintiff's "reclassification" theory) and failure to properly reevaluate his position (Plaintiff's "reevaluation" theory). See ECF No. 27 at 7–9. A threshold factual issue that has affected the Court's disposition of this claim is the extent to which these two alleged omissions are truly distinct. On the face of the Second Amended Complaint, it is not entirely clear to this Court that reclassification of one's position to managerial status and reevaluation of one's position description are necessarily mutually exclusive theories. The consequences

of this lack of clarity on Plaintiff's part have become increasingly evident as this case has progressed, especially during Plaintiff's own deposition and throughout the briefing. See, e.g., Local 1600's Br. in Supp. of Mot. for Summ. J. at 11–12, ECF No. 44 (employing conditional statements to defendant against various hypothetical case theories). This confusion was further complicated by Plaintiff's opaque response to Defendant PPL's Statement of Undisputed Facts #24, #47, and #71 that Federal Rule of Civil Procedure 56(c)(2)(B) bars him from fully responding and clarifying this and the related issue of Defendant's alleged discriminatory motives. ECF No. 50 at 30, 32, and 34. In fact, the Court notes that Rule 56(c)(2)(B) does not exist, and even if it did, this Court would certainly not exclude a Plaintiff's prime evidentiary justification for his claims as inadmissible "opinion." Further, this Court cautions that refusing to supply such critical backing for one's claim may warrant a negative inference that such evidence is nonexistent.

On motion for summary judgment, this Court must construe the allegations in the light most favorable to the nonmovant. In that light, the Court will consider Plaintiff's alleged omissions as two distinct theories on which he might prevail. This construction of Plaintiff's allegations is relevant because it permits one of his theories—the reevaluation claim—to survive the statute of limitations inquiry. Nevertheless, this Court must also determine whether any genuine issue of material fact exists as to Plaintiff's failure to exhaust his grievance procedures and as to the

merits underlying Plaintiff's claim. Because the Court finds that there are no genuine issues of material fact as to exhaustion or the merits, Defendants are entitled to summary judgment on the LMRA § 301 hybrid claim, regardless of how Plaintiff's unintelligible theory is construed. Further, this Court will address Plaintiff's intentional lack of clarity during a subsequent Rule 11 Sanctions hearing.

### 1. There is a genuine dispute of material fact as to whether Plaintiff's LMRA claim is time-barred only as it relates to his job reevaluation theory.

"The Supreme Court held in <u>DelCostello</u> that the six-month statute of limitations found in § 10(b) of the NLRA for unfair labor practice charges applies to a hybrid action." <u>Bullock v. Dressel</u>, 435 F.3d 294, 300 (3d Cir. 2006). The United States Court of Appeals for the Third Circuit has held that the limitations period begins to run "when the plaintiff receives notice that the union will proceed no further with the grievance." <u>See</u> <u>Albright v. Virtue</u>, 273 F.3d 564, 572 (3d Cir. 2001) (Becker, C.J.) (internal quotations omitted). "No explicit notice has been required by this court; the closest we have come is the statement that the period begins to run 'when it becomes clear that further union appeals would be futile.'" <u>Albright</u>, 273 F.3d at 572–73 (3d Cir. 2001) (quoting <u>Vadino v. A. Valey Engineers</u>, 903 F.2d 253, 260 (3d Cir.1990)).

Thus, "[t]he limitations period for a fair representation claim begins to run

when the plaintiff knows or reasonably should have known of the acts contributing

to the union's wrongdoing in failing to adequately represent the member's

interests." Podobnik, 409 F.3d at 593 (citing Miklavic v. USAir, Inc., 21 F.3d 551,

556 (3d Cir.1994)). Moreover, "[i]n a § 301 suit, a claim accrues against the

company defendant at the same time it accrues against the union defendant, since

the predicate for a § 301 action against an employer is proof that the union

breached its duty of fair representation." Maksin v. United Steel Workers of Am.,

136 F. Supp. 2d 375, 380 (W.D. Pa. 2000) (Ambrose, J.).

This approach requires "a case-by-case factual standard," Scott v. Local 863,

Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am., 725 F.2d

226, 229 (3d Cir. 1984) (Adams, J.), an inquiry the Third Circuit has characterized

as "court-inspired vagueness," because it "makes these cases difficult." Albright,

273 F.3d at 573. This potential lack of clarity arises because "union officials may

well be equivocal or contradictory in their communications to dissatisfied members

and may send such communications through persons within the internal union

hierarchy whose authority to bind the union is at best hazy." Albright, 273 F.3d at

573 (quoting Scott, 725 F.2d at 230 (Becker, J., concurring)).

Though the Court finds that Defendants are entitled to summary judgment

on separate grounds in the instant matter, the issue of the expiration of the statute

of limitations was heavily briefed, and the Court will clarify its position on that

question now for the sake of completeness. From the outset, it is apparent that there is no genuine issue of material fact that Plaintiff's hybrid claim would be time-barred if it relied solely on his job reclassification theory. The applicable standard outlined above requires determination of the point in time at which the futility of further proceedings had or should have become reasonably apparent to Plaintiff. In the Court's view, that date was May 4, 2011 considering only Plaintiff's job reclassification theory. On that date, Plaintiff contacted Richard John Sopko, Chief Steward for Local 1600 at the Susquehanna plant. ECF No. 50 at 39. Sopko told Plaintiff:

> The union has no interest in giving up a [bargaining unit] position. If the company wants to create a new management job and put you in it, that can be at their discretion. . . . If your intent is to turn your current position into a management job, I can't help you with that. Sorry.

Id.

"I can't help you with that. Sorry." was a sufficiently clear statement to put Plaintiff on notice that his reclassification request would no longer be furthered by the Union's efforts. This meant that Plaintiff had until November 4, 2011, 180 days later, to file his Complaint. He did not do so until January 17, 2013. See, e.g., Taylor v. Ford Motor Co., 761 F.2d 931, 934 (3d Cir. 1985) (holding that the statute of limitations for an LMRA claim began when the union had notified the employee that "the Union [had gone] its last mile, and there would be no further action").

Moreover, Plaintiff received the same notice from Daniel Zerbe, a Business Representative for Local 1600 on March 20, 2012. ECF No. 50 at 33. During that conversation, Zerbe told Plaintiff that:

> [H]e should stop his efforts and that Local 1600 would not support moving his job out of the bargaining unit.

Id. at 34, 41–45.

Again, it is sufficiently clear to this Court that this additional statement—on its own and in combination with—the May 4, 2011 email indicates a refusal on the Union's part to fulfill Plaintiff's job reclassification request. The above statement was made by Zerbe on March 20, 2012, which notwithstanding the May 4, 2011 email, would have resulted in a statute of limitations ending September 20, 2012, some four months before Plaintiff filed his first Complaint in this case.

However, neither of the communications from Sopko or Zerbe end the inquiry. Instead, both union representatives went on to suggest that the union might still be able to assist Plaintiff with his request for a formal job reevaluation. Sopko, in a follow-up email sent two minutes after the initial correspondence, wrote:

> The union will still support a job re-eval to determine if the position is paid correctly. You know I believe it is too low.

ECF No. 50 at 39. Similarly, Zerbe explains that he told Plaintiff:

> I told him he should file a Request for Job Evaluation/Reevaluation. . . . I told him to speak to Sopko to file a grievance.

ECF No. 50 at 44.

The Court finds that these subsequent comments were sufficiently vague and equivocal to raise a genuine issue of material fact at this stage. See, e.g., Albright, 273 F.3d at 575 (denying summary judgment where union communication "[a]t the very least . . . gave the impression" of subsequent union action); Id. at 573 ("Were this the only communication between the plaintiffs and the union . . . , the outcome would be clear. However, we believe that additional correspondence . . . creates an issue of material fact . . . .").

As Plaintiff points out, ECF No. 49 at 7, the Third Circuit has recognized the so-called "rays of hope" doctrine, which provides that an LMRA § 301 hybrid claim will not accrue so long as the union "proffers 'rays of hope' that the union can remedy the cause of the employee's dissatisfaction." Bensel v. Allied Pilots Ass'n, 387 F.3d 298, 305 (3d Cir. 2004) (second internal quotations omitted). Here, the Court finds that the subsequent remarks by Union officials were sufficient to "proffer rays of hope" that Plaintiff's job reevaluation claim could still be resolved with the Union's help.[6] Had the Union officials withheld their

---

[6] In the Court's view, the true bounds of the Third Circuit's "rays of hope" doctrine lie somewhere in between the two competing constructions offered by the Parties. First, the Court in no way endorses Plaintiff's extreme suggestions that "there is no single 'moment' of breach" and that this case is better viewed under a "continuing violation" or "hostile work environment" lens. ECF No. 49 at 5; ECF No. 50 at 20. In fact, the Court agrees with PPL that Plaintiff's version of the doctrine relies "upon some convoluted and conjured 'hostile work environment' allegations," ECF No. 51 at 11 n.3, and with the Union that the communications at hand are "discrete" rather than "continuous" events. ECF No. 53 at 2. At the same time, the Defendants' parallel contention that arbitration is a pre-requisite to finding "rays of hope" in the statute of limitations context, ECF No. 51 at 6–7; ECF No. 53 at 4–5, is too restrictive and

subsequent comments, the outcome at this stage would likely be the opposite one.

Ultimately, the Court finds that although there is no genuine dispute of material

fact that an LMRA claim based solely on a job reclassification theory would be

time-barred, there is a correspondingly genuine dispute that Plaintiff's job

reevaluation theory should survive the statute of limitations analysis.

Be that as it may, the Court notes that there must be some temporal limit

after which a union's purported "rays of hope" have been extinguished.[7] Any other

treatment would indefinitely expose unions to liability under § 301 simply as a

result of an employee's failure to clearly articulate his grievances or to adequately

process those grievances through prescribed procedural channels. Courts have

uniformly solved this problem by imposing a mandatory exhaustion requirement

for all § 301 claims, and that is the point to which this Court turns next.

> **2. Nevertheless, there is no genuine dispute of material fact that Plaintiff has failed to exhaust the prescribed grievance procedures and that his case does not fall within any exhaustion exception.**

"The Supreme Court instructs that, where a collective bargaining agreement

establishes a grievance procedure, an employee must at least attempt to exhaust

---

equally unsupported. See Bensel, 387 F.3d at 306 ("This Court has applied the rays of hope analysis in the absence of any arbitration proceeding. Our discussion of the doctrine makes obvious that its supporting principles are not inherently dependent on the presence of an arbitration proceeding. An arbitration proceeding is merely illustrative of one way in which a union can proffer rays of hope that it will obtain the relief the complaining employee desires in spite of a breach of its duty of fair representation.").

[7] As Plaintiff's own narrative suggests, there comes a time when a reasonable employee ought to realize that what he once considered "rays of hope" are "nothing more than false rays of hope." ECF No. 50 at 22.

such a process." <u>Podobnik</u>, 409 F.3d at 594 (citing <u>Vaca v. Sipes</u>, 386 U.S. 171, (1967)). "An employer cannot be held liable for breach of a collective bargaining agreement unless it can be shown that the employee unsuccessfully sought relief through the union grievance procedure." <u>Podobnik</u>, 409 F.3d at 594. If "it is undisputed that [an employee] did not attempt to first resolve the dispute via the grievance process, he cannot sue [his employer] for any alleged breach of the collective bargaining agreement, and consequently cannot sue [his union] for any alleged breach of the duty of fair representation." <u>Id.</u> at 595.

Courts have recognized this exhaustion requirement because "national labor policy . . . encourages private rather than judicial resolution of disputes arising over collective-bargaining agreements." <u>Clayton v. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am.</u>, 451 U.S. 679, 689 (1981). "A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. . . . [I]t would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. . . . [a]nd would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." <u>Republic Steel Corp. v. Maddox</u>, 379 U.S. 650, 653 (1965) (internal quotations omitted). As the Supreme Court of the United States has explained:

Where internal union appeals procedures can result in either complete relief to an aggrieved employee or reactivation of his grievance, exhaustion would advance the national labor policy of encouraging private resolution of contractual labor disputes. In such cases, the internal union procedures are capable of fully resolving meritorious claims short of the judicial forum. Thus, if the employee received the full relief he requested through internal procedures, his § 301 action would become moot, and he would not be entitled to a judicial hearing. Similarly, if the employee obtained reactivation of his grievance through internal union procedures, the policies underlying Republic Steel would come into play, and the employee would be required to submit his claim to the collectively bargained dispute-resolution procedures. In either case, exhaustion of internal remedies could result in final resolution of the employee's contractual grievance through private rather than judicial avenues.

Id. at 692.

The Supreme Court has recognized three exceptional situations in which an employee need not fulfill an LMRA claim's mandatory exhaustion requirement. Specifically, "courts have discretion to decide whether to require exhaustion of internal union procedures" in three circumstances: "first, [if] union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, [if] the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, [if] exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim." Clayton, 451 U.S. at 689. "If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust." Id.

In the instant dispute, the Union has pointed the Court's attention to

Prodobnik v. U.S. Postal Service, 409 F.3d 584 (3d Cir. 2005) (Van Antwerpen,

J.), a leading Third Circuit decision on the consequences of an employee's failure

to exhaust prescribed grievance procedures.[8] Podobnik involved a mail carrier

from the United States Post Office's Monroeville, Allegheny County, Pennsylvania

division. Id. at 586. After his supervisor charged Podobnik with several safety

violations, a meeting with Post Office officials was held and Podobnik was given a

letter of proposed removal stating that he had fourteen days to file a grievance

under the applicable collective bargaining agreement. Id. at 587–88. "[Podobnik]

never filed a grievance, nor did he request that [his union] do so." Id. at 588.

Analyzing Podobnik's lack of involvement in the grievance process, the

Third Circuit observed that he "did not file a grievance" and "[a]t most, . . .

initiated the 'Step 1 Grievance Procedure' by contacting his union steward and

requesting that she accompany him to discuss his grievance with his immediate

supervisor"—a course of action largely similar to if not slightly more developed

than the one at issue in this case. Id. at 594. Moreover, the requirements in

Podobnik's case, which permitted employees to initiate an official grievance

merely by meeting with their supervisors and declaring that they have a grievance,

---

[8] The analytical framework and research provided by the Union in its Brief in Support of its Motion for Summary Judgment, ECF No. 44, was particularly thorough on the issues of exhaustion and the underlying merits of a LMRA § 301 hybrid claim, an approach this Court believes helped to clarify the underlying issues.

were arguably less formal than the ones at issue here. Id. at 594. Nevertheless, the court found that Podobnik "chose not to pursue the grievance process" beyond a preliminary meeting and thus could not bring a LMRA § 301 hybrid claim unless any of the established exceptions applied. Id. at 594.

Turning to whether Podobnik's claim was saved by any of the exhaustion exceptions, the Third Circuit observed that "other than accusations substantiated with nothing more than conclusory allegations of fraud and collusion," Podobnik "presents no evidence to establish that any one of these exceptions is applicable." Id. at 594 (citing Celotex Corp., 477 U.S. at 325 ("To survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue.")). According to the court, Podobnik "[did] not explain why his failure to press his grievance further . . . was caused by malfeasance on the part of [his employer]" or "that use of the grievance procedure would have been futile or that [the union] acted against his interests." Podobnik, 409 F.3d at 594. Therefore, the court held that Podobnik could not be excused from failing to exhaust the mandatory grievance procedures. Id. That procedural shortcoming was sufficient to dispose of Podobnik's LMRA § 301 hybrid claim in its entirety on summary judgment. Id. at 594.[9]

---

[9] For a similar Third Circuit decision coming to the same conclusion, see Anjelino v. New York Times Co., 200 F.3d 73, 99 (3d Cir. 1999) (Roth, J.):

Applying the established exhaustion requirement to the facts at hand indicates that there is no genuine dispute of material fact where Plaintiff has failed to exhaust the prescribed grievance procedures and that his failure does not fall within any of the recognized exceptions. The Parties do not dispute that Plaintiff, a member of the Union, was party to the CBA with PPL, ECF No. 40, Ex. 3 at 5; ECF No. 50 at 3, or that the CBA provided for the appropriate procedural channels through which employees seeking job reevaluations might request relief. ECF No. 40, Ex. 3 at 5; ECF No. 50 at 3–4. Specifically, Article VI, Section 1 of the CBA provides that:

> The Company will prepare new or eliminate old job titles and descriptions or otherwise revise or modify them when necessary to meet changed conditions. Requests for new jobs and requests for re-evaluation for existing jobs will be handled in accordance with Exhibit N.

ECF No. 40, Ex. 4 at 66 (underlining in original). Under the heading "Existing Jobs," Exhibit N provides in pertinent part that:

---

> We will affirm the dismissal of these claims because the appellants have not demonstrated that they exhausted the Union's internal grievance procedures prior to filing charges against the Union and the Times. In particular, the District Court's dismissal of the LMRA . . . claim[ ] was based on its finding that the appellants' complaints to the Union regarding their alleged mistreatment by Times' personnel were being presented to the Baar Committee at the same time that they were before the District Court. See Anjelino, 1993 WL 170209 at *13–14. Under these circumstances, we find that dismissal of the LMRA claims was appropriate. See Angst v. Mack Trucks, Inc., 969 F.2d 1530, 1538 (3d Cir.1992) (holding that union members were required to exhaust grievance and arbitration procedures contained in CBA prior to filing suit under LMRA); see also Clayton v. Int'l. Auto. Workers, 451 U.S. 679, 692, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981).

1. A request to re-evaluate an existing job description may be initiated by an incumbent employee or appropriate supervisor.

. . .

5. If the request is not approved by the Company, Bargaining Unit employees may appeal the decision to the IBEW Local 1600 office.

6. Disagreements between the Company and Local 1600 regarding whether to submit an existing position for re-evaluation shall be resolved through the grievance procedure.

ECF No. 40, Ex. 4 at 67–68. Such extensive involvement on the part of the requesting employee is required under the CBA's protocol because evaluation of the position requires numerous pieces of information, including "written questionnaires, interviews with incumbents, interviews with supervisors, interviews with other individuals having knowledge of the job being evaluated, and/or on-the-job observations." ECF No. 40, Ex. 4 at 68.

Neither do the Parties dispute that Plaintiff failed to exhaust these mandated grievance procedures. In its Middle District of Pennsylvania Local Rule 56.1 Statement of Undisputed Facts filing, PPL averred: "74. Plaintiff testified unequivocally that he has never filed or requested that a grievance be filed on his behalf with regard to his job reevaluation or issues with his position." ECF No 40, Ex. 3 at 12 (internal citations omitted). Plaintiff responded to PPL's Undisputed Fact #74 by admitting it in full. ECF No. 50 at 7 ("74. Admitted."). See also PPL's Undisputed Fact #33, ECF No. 40, Ex. 3 at 5 ("Plaintiff testified unequivocally that

he has never filed a grievance while employed at PPL or requested that one be filed

on his behalf.") (internal citations omitted); Pl.'s Resp. to PPL's Undisputed Fact

#33, ECF No. 50 at 4 ("33. Admitted.").

In an attempt to explain away his procedural deficiencies, the Plaintiff

argues that he "did not file a grievance because he still held out hope of a change in

position." ECF No. 49 at 14. It appears questionable to this Court for Plaintiff to

take the position that he reasonably believed that his job reevaluation request was

capable of being addressed by internal union procedure but simultaneously never

felt a need to initiate a grievance—even after more than a year had passed since the

Union's initial rejection of his request. In fact, it is precisely because Plaintiff

never initiated a grievance that the record in this case is devoid of any indication of

how openly the Union would have received his complaint or how effectively it

would have processed it.

As such, to escape his failure to exhaust all required procedural hurdles, the

Plaintiff must attempt to fit his case within one of the established exceptions. This

would require Plaintiff to take the position that the grievance procedure would

have been unfair or hostile, inadequate, or unduly slow. Throughout its responsive

papers, Plaintiff fails to explicitly argue that his claim fits within any of the

established exceptions to the mandatory grievance procedure. See ECF No. 49 at

14–15. Rather, the crux of his argument against the necessity of fulfilling the

exhaustion requirement seems to be that "Plaintiff did not file a grievance because he still held out hope of a change in position." Id. at 14.

Further, there is no genuine dispute of material fact that the Union's response in this case would have been hostile or unfair, inadequate, or unreasonably slow as the exhaustion exceptions require. Quite the opposite, the record clearly demonstrates that the Union representatives with which Plaintiff interfaced provided him with helpful information, potential avenues to pursue his requests, and explicit advice as to which matters they were capable of assisting him with and which they were not. See, e.g., ECF No. 50 at 39 (Sopko email chain); ECF No 50 at 41–45 (Aff. of Zerbe). As the Third Circuit clarified in Podobnik, where an employee "does not explain why his failure to press his grievance further . . . was caused by malfeasance on the part of [his employer]" and similarly fails to "supply evidence demonstrating that use of the grievance procedure would have been futile or that [his union] acted against his interests," courts "cannot excuse his failure to exhaust the grievance process before bringing his hybrid section 301 claim." Id. at 594.

Any allegations or facts supporting the contention that resort to the Union's grievance proceedings would have been unavailing are entirely absent from the

record.[10] That's precisely because Plaintiff never initiated a grievance, despite the clear protocol set forth in the CBA and the clear instruction provided by Union officials. Those officials instructed Plaintiff as to the appropriate course of action and the requisite process he needed to take to prosecute his grievances fully. He did not take that advice. There was nothing unfair or dishonest about the officials' responses. No facts in the record suggest that the Union was acting with ulterior motives or that it surreptitiously attempted to lull Plaintiff into "sleeping on his rights"—he instead chose to doze off completely of his own accord. Therefore, there is no genuine dispute of material fact as to Plaintiff's failure to adequately satisfy the exhaustion requirement to bring a LMRA § 301 hybrid action. As such, summary judgment should be granted for both Defendants as to that claim.

> **3. Moreover, there is no genuine dispute of material fact that Plaintiff's LMRA claim fails on the merits, because Plaintiff presents no evidence that the Union breached its duty of fair representation or that PPL breached the CBA.**

"Because a union is authorized to act as the exclusive bargaining agent for its members, it has a duty to provide fair representation in the negotiation, administration, and enforcement of the collective bargaining agreement." Findley

---

[10] There are simply no material facts in the record creating a genuine dispute that the Union's response to a hypothetical grievance ever would have been unduly slow or inadequate. To the extent that Plaintiff may be understood to argue that his case was based primarily on his job reclassification request and that the Union's response was inadequate because they were unwilling to lose a bargaining unit position, then as discussed in Part III.A.1, supra, it is clear that no reasonable "rays of hope" existed at the time the Union sent its first communication in May 2011, and the statute of limitations on this action would have tolled long before Plaintiff ever filed his Complaint.

v. Jones Motor Freight, Div. Allegheny Corp., 639 F.2d 953, 957 (3d Cir. 1981) (Weis, J.) "A breach of that duty occurs when a union's conduct toward a member is 'arbitrary, discriminatory, or in bad faith.'" Id. (quoting Vaca, 386 U.S. at 190). Consequently, when courts review employment bargaining disputes, "[t]he union must be accorded a 'wide range of reasonableness' to enable it to perform effectively, but this discretion is subject to 'good faith and honesty of purpose.'" Findley, 639 F.2d at 957 (quoting Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 563–64 (1976)).

For instance, "[t]he mere refusal of a union to take a complaint to arbitration does not establish a breach of duty, even if the member's claim was meritorious." Findley, 639 F.2d at 958. Instead, "[p]roof of arbitrary or bad faith union conduct in deciding not to proceed with the grievance is necessary to establish lack of compliance with the fair representation." Id. Thus, in cases where the fervency of a union's representation is at issue, the Third Circuit has observed that the ultimate question is whether union's representation "was within the range of acceptable performance." Id. (internal quotations omitted).

To flesh out the application of this standard in the present matter, it is useful to contrast the facts at hand with those presented in Seafarers Int'l Union of N. Am. v. Thomas, 42 F. Supp. 2d 547, 554 (D.V.I. 1999) (per curium). The court in Seafarers upheld a jury verdict in favor of an employee who claimed that a union

unfairly represented him in relation to a similar reclassification claim. Id. at 555. Although the court in that case was searching merely for a "rational relation" between the verdict and the evidence presented at trial—a distinct and more lenient standard than that applied at the summary judgment stage, the contrast between this case and Seafarers is highly instructive. Specifically, the employee in that case "testified that, beginning in 1975, she repeatedly complained to union representatives about her improper classification as a Clerk Stenographer and was repeatedly told that the union was either 'looking into it' or filing a grievance on her behalf." Id. However, "[u]nion officials then testified that when [the employee's] file was examined in 1987 or 1988, there were no grievances." Id. Quite differently, the facts in this case's record do not even come close to reaching the high bar required for the formation of a discriminatory inference. Not only did the Union never misrepresent its unwillingness to take any formal action on Plaintiff's behalf, but Plaintiff himself is the one who failed to initiate the process in the first place.

Plaintiff presents no facts indicating that Union violated its duty of fair representation or treated him in an arbitrary manner. There is no evidence of bad faith on the Union's part like that presented in Seafarers. The Union did not attempt to conceal its true by motives by feigning false assistance to the Plaintiff when he came calling for help. Rather, in this Court's view, the Union's response

was quite straightforward, explaining the extent of its potential intervention and aid, and reminding Plaintiff of the requisite procedure. In fact, any evidence even seeming to indicate a potential for arbitrariness on the Union's part is absent entirely because Plaintiff himself never initiated a grievance. It simply cannot be true, as Plaintiff would have it, that he simultaneously believed both that the Union would adequately address his requests and yet act arbitrarily or discriminatory in its dealings with him.

The Court agrees with the Union that Plaintiff, purporting to address the merits of his LMRA § 301 hybrid claim in its Opposition Briefs, ECF No. 49 at 7–11; ECF No. 50 at 15–18, "merely continues his argument . . . that his claim is not time-barred" under a "misleading subheading." ECF No. 53 at 4 n.4. The Court sees no reason why Plaintiff would fail to brief the underlying merits of his own claim, particularly in light of the stipulations, ECF Nos. 45 and 47, entered into by the Parties that extended the time Plaintiff had to respond to Defendants' Summary Judgment Motions. Regardless, the Court must address these issues—with or without Plaintiff's input.

Moreover, recall that "the employee must demonstrate that he did not receive fair representation from the union as well as proving his claim against the employer." Findley, 639 F.2d at 957. "These two elements must be established before the employee is entitled to relief under § 301(a) of the Labor Management

Relations Act." Id. at 958. Thus, it is also necessary for the Court to inquire into whether PPL breached any provision of the CBA.

To illustrate, in a case before the United States District Court for the Eastern District of Pennsylvania with a posture similar to this one, Judge Raymond J. Broderick entered summary judgment in favor of an employer and union in an LMRA § 301 hybrid action. Matos v. Kurz-Hastings, Inc., 701 F. Supp. 1135, 1136 (E.D. Pa. 1988), aff'd, 879 F.2d 858 (3d Cir. 1989). Matos involved an employee who was denied both accommodations involving adjustments to his daily shifts worked and reclassification of his position. Id. at 1140. The court observed that because "plaintiff failed to identify any clause or provision of the collective bargaining agreement that obligated [his employer] to provide him with a straight shift position, to reclassify his position, to make limited duty work available, to extend his medical leave, or to continue to provide any past accommodations not required by the agreement," there was no breach of the relevant collective bargaining agreement. Id.[11]

---

[11] Similarly, in Balser v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers (IUE) Local 201, 661 F.3d 109, 121 (1st Cir. 2011), the First Circuit upheld a District Court's grant of summary judgment in favor of a union on a related classification issue. It wrote:

Balser's unsupported allegations that GE and Local 201 conspired to reclassify her position by subsequently creating the fiction of her serving as a temporary illness replacement for Doherty are insufficient to counter the record's showing of GE's objective reassessment of company staffing needs following a change in employee information. Indeed, Balser points to no testimony, email or letter correspondence, internal memoranda, or other documentation or communication

The facts of <u>Matos</u> are exceedingly similar to those at issue in the present case, and as in <u>Matos</u>, Plaintiff has not offered sufficient evidence to create a genuine dispute of material fact as to whether PPL breached the CBA. In fact, based on the evidence in the record, the Court cannot fathom how any action by PPL might have even come close to a breach of the CBA. Plaintiff offers no facts indicating that PPL was in any way obligated to entertain his reclassification request other than the proper procedures governing such reconsiderations that were set forth in CBA itself—procedures, like the rest of those involved in this case, that Plaintiff chose never to commence. Because there are no genuine disputes of material fact that the Union did not breach its duty of fair representation or that PPL did not violate the CBA, summary judgment should be granted in favor of the Defendants on Plaintiff's § 301 claim on the basis of this second and distinct ground as well.

## B. PPL's Motion for Summary Judgment is granted as to Plaintiff's ADEA and PHRA claims.

### 1. There is no genuine dispute of material fact that Plaintiff's ADEA claim is time barred, because he failed to file suit within ninety (90) days of the issuance of his EEOC right-to-sue letter.

If an employee asserting an employment discrimination claim under Title

---

supporting her contention that the Union and GE improperly schemed to reclassify; rather, the evidence shows that on learning of Doherty's subsequent and unpredicted absence—despite learning of his non-retirement plans—GE reevaluated its staffing needs in the Zyglo Sorter field.

VII chooses to initiate a formal charge with the EEOC, and the EEOC chooses not to file a civil action against the relevant employer, that employee's claim must be filed in federal court "within ninety days after the giving of such notice" by the EEOC. 42 U.S.C. § 2000e–5(f)(1). "Unlike Title VII however, [the]ADEA does not require that a 'right-to-sue' letter be first obtained." Seredinski v. Clifton Precision Products Co., Div., of Litton Sys., 776 F.2d 56, 63 (3d Cir. 1985). "ADEA plaintiffs need only wait 60 days after filing the EEOC charge." Holowecki v. Fed. Exp. Corp., 440 F.3d 558, 563 (2d Cir. 2006), aff'd, 552 U.S. 389 (2008). "However, in the event that the EEOC issues a right-to-sue letter to an ADEA claimant, the claimant must file her federal suit within 90 days after receipt of the letter." Id. (citing 29 U.S.C. § 626(e)). "[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982).

"[A] notice letter correctly delivered to a complainant's residence or postal box constitutes notice even though the complainant may not have seen the notice him or herself at the time of delivery." Ebbert v. DaimlerChrysler Corp., 319 F.3d 103, 115 n.15 (3d Cir. 2003). "[I]n the absence of other evidence, courts will presume that a plaintiff received her right-to-sue letter three days after the EEOC

mailed it." <u>Seitzinger v. Reading Hosp. & Med. Ctr.</u>, 165 F.3d 236, 239 (3d Cir. 1999) (Becker, C.J.). This is particularly true where "the right-to-sue letter was addressed to [the complainant] at the address at which [he] has received information from the EEOC since this action began." <u>Id.</u> at 239. <u>See also</u> <u>Scholar v. Pacific Bell</u>, 963 F.2d 264, 267 (9th Cir.1992) ("[W]e agree with the reasoning of the Fourth, Fifth, and Eleventh Circuits [that] . . . [t]he language of the statute establishes the 90–day period as running from the 'giving of such notice' rather than from the date claimant actually 'receives' notice in hand.").

In the instant case, the Court agrees with PPL that Plaintiff's alleged failure to receive his right-to-sue letter—despite receiving all prior EEOC communications at his record address—strains credulity. <u>See</u> ECF No. 40, Ex. 3 at 1–2; ECF No. 51 at 4. On August 30, 2012, the EEOC mailed Plaintiff a "Dismissal and Notice of Rights," stating that any subsequent lawsuit Plaintiff sought to initiate "must be filed <u>WITHIN 90 DAYS</u> of [his] receipt of this notice." ECF No. 40, Ex. 4 at 49 (capitalization and underlining in original). That right-to-sue letter was addressed to "Ernest Keister" at "11 Laurel Park Lane, Millmont, PA 17845." <u>Id.</u> According to Plaintiff, he had previously received "multiple correspondences from the EEOC, which were all addressed to him" at the same record address used in the right-to-sue letter. ECF No. 40, Ex. 3 at 1–2; ECF No. 50 at 1. Plaintiff has resided at the above Millmont, Union County, Pennsylvania

location uninterrupted for at least the past twenty years and never notified the EEOC of any change of address. ECF No. 40, Ex. 3 at 1–2; ECF No. 50 at 1–2.

Consistent with the above-referenced authorities, this Court finds that Plaintiff possessed sufficient notice such that the ninety-day period within which he might file a complaint began to run no later than three days after August 30, 2012, which pursuant to Fed. R. Civ. P. 6(a)(1), was Tuesday, September 4, 2012.[12] Consequently that ninety-day period would have concluded on Monday, December 3, 2012. Plaintiff did not file his Complaint until January 17, 2013, forty-five (45) days late.

Given the tardiness of Plaintiff's Complaint, it may only be saved by fitting it within an exception that merits equitable tolling. However, no such equitable tolling is appropriate in this case. In Baldwin County Welcome Center v. Brown, 466 U.S. 147, 151 (1984), the Supreme Court of the United States discussed certain circumstances that might warrant equitable tolling of the ninety-day period. The Third Circuit, in Ford v. Temple Hosp., 790 F.2d 342, 350 (3d Cir. 1986) (Higginbotham, Jr., J.), distilled that discussion into a list that read:

> (1) [W]here notice from the EEOC does not adequately inform plaintiff of the requirement that suit be commenced within the statutory period; (2) where a motion for appointment of counsel is

---

[12] Under the Third Circuit's three-day implied notice rule, the technical notice date would have been Sunday, September 2, 2012. However, because mail would not have been delivered that day (or on Labor Day Monday, which fell immediately thereafter on September 3, 2012), the Court implies notice as of Tuesday, September 4, 2012. See Edwards v. Bay State Mill. Co., 519 F. App'x 746, 748 n.2 (3d Cir. 2013).

> pending; (3) where the court itself has led plaintiff to believe that she has satisfied all statutory prerequisites to suit; and (4) where the defendant has, through affirmative misconduct, lulled the plaintiff into inaction.

Before reaching those exceptions, the Brown Court cautioned that "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants" because "strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." Brown, 466 U.S. at 152. Further, "[p]laintiff bears the burden to show that equitable tolling is warranted." Carter v. Keystone, 360 F. App'x 271, 273 (3d Cir. 2010) (per curium).

As relevant to this case, the Third Circuit in Ford held that a claimant seeking to toll the ninety-day period as a result of "belated receipt of the right to sue letter" could not prevail because that excuse "does not come close enough to the kind of showing required to invoke the doctrine of equitable tolling." Id. According to the Third Circuit, neither was equitable tolling appropriate where a plaintiff "allow[ed] so much time to pass between the [right-to-sue] deadline and the date she filed her complaint," regardless of "misstatements that may have been made by her attorney or his staff." Rockmore v. Harrisburg Prop. Serv., 501 F. App'x 161, 164 (3d Cir. 2012) (per curium). The Court finds it inappropriate to apply the doctrine of equitable tolling in this case as well. Mere delay and inaction

on the part of a litigant or his attorney do not constitute the types of exceptional

circumstances contemplated by equitable principles, and Plaintiff has failed to

advance any potential justifications for his late filing. See <u>Carter</u>, 360 F. App'x at

273 ("[Plaintiff] offers no viable argument at all for an equitable tolling of the

limitations period, and his complaint, as plainly indicated on its face, was filed

well after expiration of the ninety-day period to bring suit."). Therefore, there is no

genuine dispute of material fact that Plaintiff's ADEA claim was time-barred.[13]

### 2. There is no genuine dispute of material fact that Plaintiff has failed to present an adequate <u>prima facie</u> case of age discrimination under the ADEA or the PHRA.

"The same legal standard applies to both the ADEA and the PHRA and

therefore it is proper to address them collectively." <u>Kautz v. Met-Pro Corp.</u>, 412

F.3d 463, 466 n.1 (3d Cir. 2005) (Aldisert, J.). "To prevail on an intentional age

discrimination claim under either the ADEA or the analogous provision of the

---

[13] Given the finding that Plaintiff himself had sufficient notice of the issuance of the right-to-sue letter, the Court, for several reasons, finds it largely irrelevant to discuss Plaintiff's allegations that his Counsel did not receive the notice-to-sue letter at the appropriate address. First, as a matter of law, courts have implied a client's notice to his attorney and <u>vice versa</u>. <u>Irwin v. Dep't of Veterans Affairs</u>, 498 U.S. 89, 91 (1990) ("[Title VII] it does not specify receipt by the claimant rather than by the claimant's designated representative."). Moreover, the Court finds the evidence on this particular issue inconclusive and not fully borne out by the record. <u>See, e.g.</u>, ECF No. 50 at 37. Last, the Court notes that Plaintiff filed his EEOC Charge on June 28, 2011, ECF No. 40, Ex. 4 at 44, meaning that the mandatory 60-day waiting period for ADEA claimants who do choose to file an official charge had expired on August 27, 2011, after which time counsel was free to request the letter. <u>See Burgh v. Borough Council of Borough of Montrose</u>, 251 F.3d 465, 470 (3d Cir. 2001) (citing 29 C.F.R. § 1601.28(a)(1)). The record is absent of any follow-up action on Plaintiff's part following the expiration of that deadline until over a year later in a letter sent by his Counsel on December 21, 2012. ECF No. 50 at 37.

PHRA, a plaintiff must show that his or her age actually motivated or had a determinative influence on the employer's adverse employment decision." <u>Fasold v. Justice</u>, 409 F.3d 178, 183-84 (3d Cir. 2005) (internal citations and quotations omitted). In <u>Smith v. City of Allentown</u>, 589 F.3d 684 (3d Cir. 2009) (Jordan, J.) the Third Circuit affirmed the "continued application of the <u>McDonnell Douglas</u> paradigm in age discrimination cases." <u>Id.</u> at 691. "Under <u>McDonnell Douglas</u>, the plaintiff bears the burden of proof and the initial burden of production." <u>Id.</u>

To establish a <u>prima facie</u> case of age discrimination, a plaintiff must prove: "that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." <u>Smith</u>, 589 F.3d at 689. In the context of non-promotion or non-reclassification claims, the Third Circuit has cast the <u>prima facie</u> elements as requiring a plaintiff to show that: "(1) he belongs to the protected class; (2) either that he applied and was qualified for the supervisory position and was not appointed, or that he was performing satisfactorily in his present position and was actually or constructively dismissed, and (3) that a person sufficiently younger to raise an inference of age discrimination was employed in his stead." <u>Spangle v. Valley Forge Sewer Auth.</u>, 839 F.2d 171, 173 (3d Cir. 1988)

(Mansmann, J.).

As the Court reads Plaintiff's Brief in Opposition to PPL's Motion for Summary Judgment, ECF No. 50 at 14–17, it seems to be the case that Plaintiff's core age discrimination theory is that his job classification and attendant salary did not reflect the type of tasks for which he was responsible at work. See ECF No. 50 at 14 ("At the time of the filing of his Complaint, Plaintiff was 67 years old the only person [sic] who performing [sic] the duties and functions for which he was responsible. . . . He was qualified for his position and continued to suffer adverse employment actions, including losing out on compensation he was rightly owed for the duties he was actually performing."). Plaintiff alleges that despite his exemplary work ethic, "he was refused the chance to gain a management position that would reflect the duties and responsibilities he was already performing and reward him appropriately for the work he provided." Id. at 15.

The circumstances Plaintiff has described do not constitute age discrimination—in fact, they seem to have nothing to do with comparative ages among workers at PPL whatsoever. Instead, what Plaintiff has attempted to cast as age discrimination is nothing more than a permissible business judgment on PPL's part. Further, Plaintiff has provided no facts indicating that this business judgment was in any fashion linked to Plaintiff's age. In reality, Plaintiff's "age discrimination" claim would have been more appropriately addressed through the

CBA's prescribed procedures and later through the Union's grievance system. The Court wonders if perhaps Plaintiff felt compelled to plead an age discrimination claim based upon his failure to adequately pursue relief through those more appropriate channels.

In any event, it is clear to this Court that Plaintiff's purported age discrimination theory is unfounded. The standard age discrimination claim requires a Plaintiff to prove that he was treated less equitably than those workers who were in a younger age bracket. Plaintiff here shows only that he was treated exactly the same as (or perhaps, even better than) that class. The crux of his argument is that he was not promoted to a higher rank on the corporate ladder despite his extensive responsibilities. It seems reasonable that a person in Plaintiff's position might have a dispute with other workers who have been promoted instead of him, but unless those workers were significantly younger than him, and he was passed over because of his age, it escapes this Court's grasp as to how Plaintiff's theory could possibly form the basis of an age discrimination claim.[14] As the Supreme Court has admonished when speaking about the insufficiency of purported age discrimination claims like that Plaintiff has alleged, "[t]he enemy of 40 is 30, not 50." <u>Gen.</u>

---

[14] Plaintiff contends that his claim is appropriately classified as "age discrimination" because PPL's hypothetical reclassification of his position "would increase his pay and ultimately increase his funds at the time of retirement." ECF No. 50 at 17. However, as PPL points out, Plaintiff repeatedly testified that he received similar treatment even before he reached the ADEA's effective age of forty (40) years-old. ECF No. 42 at 23. Moreover, accepting Plaintiff's novel theory would unnecessarily expose employers everywhere to ADEA liability every time they made a non-promotion decision.

Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 591 (2004) (Souter, J.).

Interestingly, Plaintiff argues that he "has younger electricians and foreman under his direct supervision that he has taken to training and given specific knowledge of the system." Id. at 15. That fact seems to suggest that, in practice, he is treated better than his younger co-workers, a sort of de facto senior lead—a role that emerges organically in many contexts.[15] Even more confounding, Plaintiff suggests that "[h]e cannot provide any comparative data about younger employees in the context of a traditional ADEA charge because he is and was the only person at his branch doing this job." Id. at 16 (emphasis in original). That absence of similarly-situated comparators is equally fatal to Plaintiff's age discrimination claim, as Plaintiff has essentially failed to adduce any evidence suggesting his non-promotion or non-reclassification was in any way causally connected with his age.[16] In sum, Plaintiff alleges no evidence giving rise to an inference of age discrimination. Thus, there is no genuine dispute of material fact that Plaintiff's

---

[15] Plaintiff spends an inordinate amount of space in his brief arguing that there is no "replacement requirement" to allege a successful ADEA claim. ECF No. 50 at 15–17. Even accepting that argument as true, Plaintiff himself acknowledges that a meritorious ADEA claim requires "evidence 'adequate to create an inference' of discrimination." Id. at 16. Further, the adverse action at issue here is non-promotion, not termination. The Court thus finds it apparent that termination and subsequent replacement by a younger worker are not at issue here.

[16] In Plaintiff's Deposition, ECF No. 40, Ex. 4, he briefly references a co-worker named "Bob Schecterly" who purportedly was transferred from the bargaining unit to a management position. Id. at 17. However, Plaintiff was unable to indicate how exactly Mr. Schecterly obtained his managerial position, at what time Mr. Schecterly was transferred, or what his age was at the time. Id. Plaintiff provides no further substance relating to Mr. Schecterly, and according to Plaintiff, "he was about [Plaintiff's] age" or "older"). Id. at 17.

ADEA and PHRA age discrimination claims must fail.

### C. PPL's Motion for Rule 11 Sanctions.

"It is now clear that the central purpose of Rule 11 is to deter baseless filings in district court and thus, consistent with the Rules Enabling Act's grant of authority, streamline the administration and procedure of the federal courts." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990). "Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and not interposed for any improper purpose." Id. (internal quotations omitted). "[T]he intended goal of Rule 11 is accountability." Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 94 (3d Cir. 1988) (Weis, J.). "The standard for testing conduct under Rule 11 is reasonableness under the circumstances." Teamsters Local Union No. 430 v. Cement Exp., Inc., 841 F.2d 66, 68 (3d Cir. 1988) (Mansmann, J.). "The rule imposes on counsel a duty to look before leaping and may be seen as a litigation version of the familiar railroad crossing admonition to 'stop, look, and listen.'" Lieb v. Topstone Indus., Inc., 788 F.2d 151, 157 (3d Cir. 1986) (Weis, J.). "To comply with these requirements, counsel must conduct 'a reasonable investigation of the facts and a normally competent level of legal research to support the presentation.'" Mary Ann Pensiero, Inc., 847 F.2d 90, 94 (3d Cir. 1988) (quoting Lieb, 788 F.2d at 157).

The Court is convinced that a Rule 11 Sanctions Hearing is appropriate in this matter for two independent reasons. First, as outlined in detail by this Memorandum, the claims filed by Plaintiff's Counsel are meritless and should otherwise fail on procedural grounds. Moreover, Plaintiff has actively complicated the disposition of his claims by, among other things, offering incomplete responses to certain of PPL's key Undisputed Facts; failing to address any of the Union's Undisputed Facts; and advancing allegations in his Second Amended Complaint that diverge significantly from the actual evidence adduced by Plaintiff.

Second, this Court notes that Plaintiff's Counsel is beginning to amass a track record of questionable and unprofessional conduct in this District and other forums. For instance, in 2011, Judge Lawrence F. Stengel of the United States District Court for the Eastern District of Pennsylvania termed one of Plaintiff Counsel's actions a "dubious employment discrimination claim," before dismissing the attendant Rule 11 Motion on procedural grounds. <u>Knoll v. City of Allentown</u>, No. CIV.A. 08-04692, 2011 WL 4528336 (E.D. Pa. Sept. 30, 2011). In addition, less than three months ago, Judge Robert D. Mariani of this Court granted in part a Rule 11 Motion against Plaintiff's Counsel in a similar action and imposed a sanction of "public acknowledgement." <u>Moore v. Air Methods, Inc.</u>, No. 3:14-CV-0684, 2015 WL 4590988 (M.D. Pa. July 29, 2015). The Court also points the Parties' attention toward a pending Pennsylvania Disciplinary Board Decision that

will result in Plaintiff Counsel's "public reprimand." <u>See</u> 111 DB 2015.

## IV. CONCLUSION

The timeline of this case reveals a consistent failure on the part of Plaintiff and his counsel to exhaust prescribed grievance procedures and to meet fixed filing deadlines. Such delinquency, particular with regard to Plaintiff's LMRA claim, effectively undercut the merits of his underlying case theory. These threshold procedural hurdles may not be sidestepped by unwilling or unprecise litigants. After all, such limitations serve dual, well-established purposes: first, to require "diligent prosecution of known claims" and second, to "promote justice by preventing . . . revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." <u>CTS Corp. v. Waldburger</u>, 134 S. Ct. 2175, 2183 (2014) (Kennedy, J.). Moreover, the record is devoid of any evidence even slightly suggesting that Plaintiff's job was not reclassified or reevaluated because of his age. Because there are no genuine disputes of material fact precluding summary judgment as to the presence of these procedural errors or as to the weakness of Plaintiff's underlying claims, summary judgment is granted in favor of both Defendants on all claims in full. PPL's Motion for Rule 11 Sanctions is held in abeyance pending a hearing before this Court.

An appropriate Order follows.

BY THE COURT:


<u>/s Matthew W. Brann</u>
Matthew W. Brann
United States District Judge