**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERNEST KEISTER, | : | No. 4:13-cv-00118 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Brann) |
| v. | : | |
| | : | |
| PPL CORPORATION AND | : | |
| INTERNATIONAL BROTHERHOOD | : | |
| OF ELECTRICAL WORKERS, | : | |
| LOCAL 1600, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

December 29, 2015

The Rule 11 Sanctions Motion and the Rule 54 Motion for Fees disposed of herein both spring from the filing of a baseless employment discrimination suit. Donald P. Russo, Esquire, the lawyer who brought the underlying claims, is no stranger to Rule 11 discipline. Other federal judges have described his work as "dubious" and "troubling." In fact, just one week before filing his opposition briefs to Defendants' Summary Judgment Motions here, Mr. Russo was sanctioned in the form of public reprimand by the Honorable Robert D. Mariani of this Court for similar conduct in a similar case. Mr. Russo was also recently sanctioned on public reprimand by the Supreme Court of Pennsylvania's Disciplinary Board.

Because Mr. Russo has now engaged in a subsequent Rule 11 violation in

connection with this vexatious litigation, both PPL's Motion for Rule 11 Sanctions and the Union's Rule 54 Motion for Fees will be granted in full. Moreover, because no prior disciplinary measures have succeeded in deterring Mr. Russo from bringing frivolous employment discrimination suits in federal court while simultaneously attempting to disguise those suits' underlying weaknesses in order to prolong otherwise needless litigation, this Court also concludes that an award of reasonable attorney's fees is the least severe sanction needed to deter Mr. Russo's improper conduct.

## I.   BACKGROUND

Plaintiff Ernest Keister, through his counsel Mr. Russo, brought this spurious employment discrimination lawsuit against PPL Corporation and the International Brotherhood of Electrical Workers, Local 1600 Union on January 17, 2013.[1] The lawsuit was filed one year and seven months after Plaintiff initiated his EEOC charge, ten months after Plaintiff's last meaningful communication with the Union and four months after the EEOC dismissed Plaintiff's charge and issued his right-to-sue letter.[2] Not only did the lawsuit suffer from blatant timeliness defects, but it also failed to demonstrate that either Defendant harbored any discriminatory

---

[1]  According to PPL, Plaintiff erroneously listed his official employer as PPL Corporation or PPL Services Corporation. PPL states that "[a]t all relevant times, Plaintiff's actual employer was PPL Susquehanna, LLC (since renamed 'Susquehanna Nuclear, LLC')." ECF No. 40 at 1 n.1.

[2]  <u>See</u> ECF No. 54 at 5, 38–40.

animus toward Plaintiff whatsoever.[3]

In a nutshell, Plaintiff's lawsuit, the entirety of which was disposed of by this Court's October 6, 2015 Memorandum granting in full both Defendants' Motions for Summary Judgment, alleged two claims of age discrimination against PPL—one under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. ("ADEA") and a second under the Pennsylvania Human Relations Act, 43 P.S. §§ 951 et seq. ("PHRA")—as well as a third claim involving a supposed hybrid violation of § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) ("LMRA") brought against both PPL and the Union.[4] As the evidence unwound itself during discovery and depositions, it became clear that Plaintiff lacked any evidence of the wrongs he pleaded. Quite frankly, as detailed more fully herein, certain of Plaintiff's key factual allegations, which helped his Second Amended Complaint survive so long, turned out to be unrepresentative of the truth and often were wholly at odds with Plaintiff's own deposition testimony. Plaintiff lost, it turned out, primarily because he failed to exhaust his remedies by never initiating a grievance, because his action was untimely, and because Defendants had never, in fact, discriminated against him.

As this might suggest, apart from its status as a run-of-the-mill employment dispute lacking little evidence of discrimination, Plaintiff's action suffered from a

---

[3] See id. at 42.
[4] See ECF No. 54.

far more disconcerting flaw: it was needlessly kept alive at several junctures that should have resulted in its outright termination—a sort of litigious necromancy conjured up by Mr. Russo's specious filings to coerce the Defendants into settling a meritless claim. Absent Mr. Russo's attempts to manufacture facts, warp the law, and utterly cloud the action's underlying allegations, this case would have disappeared long ago, saving Defendants, the Court, and the public significant time and money.

Like so many times in the past, Mr. Russo unfortunately chose not to take the straightforward path. In fact, Mr. Russo is quite familiar with Rule 11 Sanctions and related ethical scrutiny. The Honorable Lawrence F. Stengel of the United States District Court for the Eastern District of Pennsylvania has previously termed Mr. Russo's employment discrimination work "dubious," "ill-conceived," "poorly presented," "silly," and "riddled with credibility shortcomings."[5] In addition, as noted above, just one week before he filed his briefs in opposition to Defendants' Summary Judgment Motions in this case, Mr. Russo was publicly sanctioned under Rule 11 by the Honorable Robert D. Mariani of this Court for maintaining a similar employment discrimination claim that Judge Mariani deemed

---

[5] <u>Knoll v. City of Allentown</u>, No. CIV.A. 08-04692, 2011 WL 4528336, at *1 (E.D. Pa. Sept. 30, 2011).

"patently unmeritorious" and "frivolous."[6] Judge Mariani would go on to criticize Mr. Russo's "litigation history" as "troubling."[7] Mr. Russo also recently received a second public reprimand, this time from the Supreme Court of Pennsylvania's Disciplinary Board.[8] Suffice it to say, Mr. Russo is simply not getting the message.

The Court trusts that Mr. Russo's consistently questionable practices will cease today. PPL has filed a Motion for Rule 11 Sanctions, and the Union has filed a Rule 54 Motion for Fees and Costs. Based on this Court's consideration of the present matter, its review of past actions involving Mr. Russo, and a hearing held before the Court to address the pending motions, it is evident that the instant lawsuit was meritless and that Mr. Russo has yet to be adequately deterred from filing "dubious" employment suits in federal court. Accordingly, Defendants' Motions are both granted in full, and the parties are hereby directed to submit a comprehensive accounting of their expenses and fees, supported by adequate affidavits, in accordance with this Memorandum and the Court's attached Order.[9] The Court deems an award of reasonable attorney's fees to be the least severe sanction necessary to deter Mr. Russo's tendency to file frivolous actions.

---

[6] Moore v. Air Methods, Inc., No. 3:14-CV-0684, 2015 WL 4590988, at *6 (M.D. Pa. July 29, 2015).

[7] Id. at *10.

[8] 111 DB 2015.

[9] Such filings should detail the exact expenses and fees incurred, with sufficient detail that the Court is capable of determining whether such expenses, costs, or fees are duplicitous, excessive, or otherwise unnecessary. The Court will then allow a brief period for Mr. Russo to formally contest any of Defendants' accountings before giving Defendants a brief opportunity to reply.

## II.   LAW

Federal Rule of Civil Procedure 11 provides in pertinent part that:

(b)   **Representations to the Court.** By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1)   it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2)   the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3)   the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4)   the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(c)   **Sanctions.**

(1)   In General. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

The Supreme Court of the United States and the United States Court of

Appeals for the Third Circuit have developed a consistent jurisprudence as it

pertains to Rule 11 Sanctions.[10] "It is now clear that the central purpose of Rule 11 is to deter baseless filings in district court and thus, consistent with the Rules Enabling Act's grant of authority, streamline the administration and procedure of the federal courts."[11] "Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and not interposed for any improper purpose."[12] "[T]he rule emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable."[13] "The word 'sanctions' in the caption . . . stresses a deterrent orientation in dealing with improper pleadings, motions or other papers."[14] "[T]he intended goal of Rule 11 is accountability."[15]

"The standard for testing conduct under Rule 11 is reasonableness under the circumstances."[16] "The rule imposes on counsel a duty to look before leaping and may be seen as a litigation version of the familiar railroad crossing admonition to 'stop, look, and listen.'"[17] "It may be rephrased, 'Stop, Think, Investigate and

---

[10] The law pertaining to Rule 54 Motions for Fees and Costs is set out more fully later in the Memorandum in Part III.G.

[11] Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990).

[12] Id. (internal quotations omitted).

[13] Ellis v. Beemiller, Inc., 287 F.R.D. 326, 347 (W.D. Pa. 2012) (internal citations and quotations omitted).

[14] Doering v. Union Cty. Bd. of Chosen Freeholders, 857 F.2d 191, 194 (3d Cir. 1988).

[15] Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 94 (3d Cir. 1988) (Weis, J.).

[16] Teamsters Local Union No. 430 v. Cement Exp., Inc., 841 F.2d 66, 68 (3d Cir. 1988).

[17] Lieb v. Topstone Indus., Inc., 788 F.2d 151, 157 (3d Cir. 1986) (Weis, J.).

Research' before filing papers either to initiate a suit or to conduct the litigation."[18]

"These obligations conform to those practices which responsible lawyers have always employed in vigorously representing their clients while recognizing the court's duty to serve the public efficiently."[19]

"To comply with these requirements, counsel must conduct 'a reasonable investigation of the facts and a normally competent level of legal research to support the presentation.'"[20] "This standard is more stringent than the original good faith formula and thus it is expected that a greater range of circumstances will trigger its violation."[21] "In applying this standard, the court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted."[22] Rule 11 Sanctions are appropriate, for instance, "when the claimant exhibits a deliberate indifference to obvious facts."[23]

"Rule 11 sanctions should not be viewed as a general fee shifting device. By and large federal courts are bound by the 'American Rule,' requiring parties to

---

[18] Gaiardo v. Ethyl Corp., 835 F.2d 479, 482 (3d Cir. 1987) (Weis, J.).
[19] Id.
[20] Mary Ann Pensiero, Inc., 847 F.2d at 94 (quoting Lieb, 788 F.2d at 157).
[21] Lieb, 788 F.2d at 157.
[22] CTC Imports & Exports v. Nigerian Petroleum Corp., 951 F.2d 573, 578 (3d Cir. 1991) (Nygaard, J.).
[23] Baker v. Alderman, 158 F.3d 516, 524 (11th Cir. 1998).

shoulder their own legal expenses."[24] "Litigants misuse the Rule when sanctions are sought against a party or counsel whose only sin was being on the unsuccessful side of a ruling or judgment. Restated, Rule 11 sanctions awarding counsel fees do not automatically or usually follow an adverse judgment or ruling. Substantially more is required."[25] "Rule 11 is instead reserved for only exceptional circumstances."[26] "Similarly, just as mere failure to prevail does not trigger a sanction award, neither does advocating new or novel legal theories."[27] Courts should not apply Rule 11 "to inhibit imaginative legal or factual approaches to applicable law or to unduly harness good faith calls for reconsideration of settled doctrine."[28] "The Rule seeks to strike a balance between the need to curtail abuse of the legal system and the need to encourage creativity and vitality in the law."[29]

Above all else, "[g]reater attention by the district courts to pleading and motion abuses and the imposition of sanctions when appropriate, should discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses."[30] The Third Circuit and the Advisory Committee Notes to Rule 11have set forth certain factors useful in determining

---

[24] Gaiardo, 835 F.2d at 483 (citing Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240 (1975)).

[25] Gaiardo, 835 F.2d at 483.

[26] Morristown Daily Record, Inc. v. Graphic Commc'ns Union, Local 8N, 832 F.2d 31, 32 (3d Cir. 1987) (Weis, J.).

[27] Gaiardo, 835 F.2d at 483.

[28] Id.

[29] Id. at 483–84.

[30] Fed. R. Civ. P. 11 Advisory Committee Notes to 1983 Amendment.

whether an attorney's conduct has violated Rule 11. Those factors include:

> [H]ow much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper; whether the pleading, motion, or other paper was based on a plausible view of the law; [ ] whether he depended on forwarding counsel or another member of the bar; [and] whether [one] is in a position to know or acquire the relevant factual details.[31]

Once a violation of Rule 11 has been established, a district court "has discretion to tailor sanctions to the particular facts of the case."[32] "The court has available a variety of possible sanctions to impose for violations, such as striking the offending paper; issuing an admonition, reprimand, or censure; requiring participation in seminars or other educational programs; ordering a fine payable to the court; referring the matter to disciplinary authorities . . . , etc."[33] "The basic principle governing the choice of sanctions is that the <u>least</u> <u>severe</u> sanctions <u>adequate</u> to serve the purpose should be imposed."[34] Thus, the appropriate sanction must still achieve Rule 11's central purpose: "deterrence of frivolous lawsuits."[35]

---

[31] Fed. R. Civ. P. 11 Advisory Committee Notes to 1983 Amendment; <u>CTC Imports & Exports</u>, 951 F.2d at 578.

[32] <u>Doering</u>, 857 F.2d at 194.

[33] Fed. R. Civ. P. 11 Advisory Committee Notes to 1993 Amendment ("Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty. However, under unusual circumstances, particularly for (b)(1) violations, deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation. Accordingly, the rule authorizes the court, if requested in a motion and if so warranted, to award attorney's fees to another party.").

[34] <u>Doering</u>, 857 F.2d at 194.

[35] <u>See</u> <u>id.</u> at 193.

To that end, federal courts in the Third Circuit's venire and the Advisory

Committee Notes to Rule 11 have also set forth certain factors useful in

determining the appropriate sanction for a violation of Rule 11. They include:

> Whether the improper conduct was willful, or negligent; whether it
> was part of a pattern of activity, or an isolated event; whether it
> infected the entire pleading, or only one particular count or defense;
> whether the person has engaged in similar conduct in other litigation;
> whether it was intended to injure; what effect it had on the litigation
> process in time or expense; whether the responsible person is trained
> in the law; what amount, given the financial resources of the
> responsible person, is needed to deter that person from repetition in
> the same case; what amount is needed to deter similar activity by
> other litigants: all of these may in a particular case be proper
> considerations.[36]

## III.   ANALYSIS

### A.   Neither Of Defendants' Motions Are Untimely.

Mr. Russo's lead counterargument as it relates to both PPL's Rule 11

Motion for Sanctions and the Union's Rule 54 Motion for Fees is that they are

untimely filed. That contention is incorrect as it relates to both Motions. First, with

regard to PPL's Motion, Mr. Russo contends that "[i]n light of the Pensiero Rule,

. . . the timing of Defendant PPL's Motion for Rule 11 Sanctions is dubious."[37] To

the contrary, in Mary Ann Pensiero, Inc. v. Lingle, the Third Circuit "adopt[ed] as

a supervisory rule for the courts in the Third Circuit a requirement that all motions

---

[36] Fed. R. Civ. P. 11 Advisory Committee Notes to 1993 Amendment. See also In re Cendant Corp. Derivative Action Litig., 96 F. Supp. 2d 403, 407-08 (D.N.J. 2000). Because it will impose monetary sanctions, the Court must also consider the Doering factors as set forth at 857 F.2d 195–97. Those factors are considered subsequently in this Memorandum.

[37] ECF No. 41 at 3.

requesting Rule 11 sanctions be filed in the district court before the entry of a final judgment."[38] PPL satisfied the <u>Pensiero</u> rule here, submitting its Motion for Rule 11 Sanctions in contemporaneous fashion with its Motion for Summary Judgment and in any event, well before entry of final judgment. In fact, so as to preserve judicial economy in accordance with the Third Circuit's decision in <u>Pensiero</u>, the Court has decided to withhold entry of final judgment until all pending motions in this case have been resolved. Moreover, as PPL's counsel explained in their papers and during the Rule 11 hearing before this Court, filing of its client's Rule 11 Sanctions Motion as swift as practicable, given the evident need to obtain certain discovery before the inadequacy of Plaintiff's claims were fully realized.[39]

Second, as far as the Union's Rule 54 Motion for Fees goes, Mr. Russo argues that "Defendant IBEW's Motion for Attorney's Fees and Taxable Costs pursuant to F.R.C.P. No. 54(d)(2) was filed by Defendant IBEW prior to the entry of a final judgment by the court" and is therefore premature.[40] For several reasons, the Court considers that argument entirely unavailing. First, the only reason why this Court has withheld entry of a final judgment is to promote judicial economy and to save each of the parties from incurring additional unnecessary expenses. Rather than return for subsequent hearings, issue separate memorandum opinions,

---

[38] 847 F.2d 90, 100.

[39] The Court notes that Mr. Russo advanced this same unsuccessful argument in his previous Rule 11 case, <u>Moore v. Air Methods, Inc.</u>, No. 3:14-CV-0684, 2015 WL 4590988 (M.D. Pa. July 29, 2015).

[40] ECF No. 60 at 1.

and enable several distinct appeals of various final judgments, the Court (and

Defendants too, for that matter) believed it most efficient to consolidate resolution

of the Defendants' Motions for Summary Judgment with that of the Motion for

Rule 11 Sanctions and the Rule 54 Motion for Fees.

Such active management is mandated by Federal Rule of Civil Procedure 1,

which now provides that federal procedure "should be construed, administered,

and employed by the court and the parties to secure the just, speedy, and

inexpensive determination of every action and proceeding."[41] It also saves the

appellate court from excess work and undue frustration. As the Third Circuit

explained in <u>Pensiero</u>:

> Rather than misusing scarce resources, timely filing and disposition of Rule 11 motions should conserve judicial energies. In the district court, resolution of the issue before the inevitable delay of the appellate process will be more efficient because of current familiarity with the matter. Similarly, concurrent consideration of challenges to the merits and the imposition of sanctions avoids the invariable demand on two separate appellate panels to acquaint themselves with the underlying facts and the parties' respective legal positions.[42]

The Court finds it unremarkable that such logic would also apply to

---

[41] The Advisory Committee Notes to the 2015 Amendment to Rule 1 explain that "Rule 1 is amended to emphasize that just as the court should construe and administer these rules to secure the just, speedy, and inexpensive determination of every action, so the parties share the responsibility to employ the rules in the same way. Most lawyers and parties cooperate to achieve these ends. But discussions of ways to improve the administration of civil justice regularly include pleas to discourage over-use, misuse, and abuse of procedural tools that increase cost and result in delay. Effective advocacy is consistent with—and indeed depends upon—cooperative and proportional use of procedure."

[42] 847 F.2d at 99.

disposition of a Rule 54 Motion for Fees—particularly given the "hybrid" nature of the underlying LMRA § 301 claim here. There was such significant factual overlap between the claims and defenses alleged against and put forth by both Defendants here on the hybrid LMRA claim that disposition of these two pending motions in distinct fashion would simply not be warranted as a matter of common sense and judicial economy.

Moreover, as has become par for the course in this litigation, Mr. Russo has cited an unsupportive statutory provision for his argument. He contends that because Rule 54(d)(2)(B)(i) states that a motion for attorney's fees "be filed no later than 14 days after the entry of judgment," the Union's is untimely as premature. That is simply a misreading of that provision. The Union has satisfied that requirement without question, as no final judgment has yet been entered after which fourteen days could have theoretically passed.

To remedy Mr. Russo's oversight, the Union chose to explain in its papers what the most persuasive argument for Mr. Russo should have been, before demonstrating why that argument would nevertheless have been unavailing.[43] That missing argument should have been that Rule 54(d)(2)(B)(ii) requires specification of "the judgment . . entitling the movant to the award."[44] However, as explained,

---

[43] The Court notes its appreciation of the thoroughness, organization, and forthrightness exhibited by the Union's and PPL's briefs and oral presentations.

[44] ECF No. 61 at 7.

considerations of judicial economy and the particularized posture of this case both

support disposition of the Rule 54 Motion for Fees at this time, concurrently with

PPL's Motion for Rule 11 Sanctions. Furthermore, the Court finds that it would

otherwise strain the purpose of Rule 54 to refuse to resolve the Union's Motion for

Fees now, as final judgment would have already been entered but for the need to

withhold it pending disposition of all related Rule 11 claims  pursuant to

Pensiero.[45] There is no reason why the Court should not take up both the Rule 11

Motion and the Motion for Fees rather simultaneously rather than dismissing one

without prejudice only to be filed soon thereafter to satisfy a mere formality.[46]

> **B.    Rule 11 Sanctions Are Warranted Because The Factual Contentions In Plaintiff's Second Amended Complaint Lacked Evidentiary Support And Were Not Likely To Have Evidentiary Support After A Reasonable Opportunity For Further Investigation Or Discovery.**

Plaintiff filed his initial Complaint as well as two subsequent Amended

---

[45] See Shaw v. Cumberland Truck Equip. Co., No. CIV.A. 09-359, 2012 WL 1130605, at *2 (M.D. Pa. Mar. 30, 2012) (holding that a motion for attorney's fees was "not premature and [was] timely filed" despite opposing argument that "determination should be stayed pending a final judgment on the merits"); Weyant v. Okst, 198 F.3d 311, 315 (2d Cir. 1999) ("Because the 14-day period established by Rule 54(d)(2)(B) for the filing of a motion for attorneys' fees was introduced in large part to avoid piecemeal appeals of merits and fee questions, that 14-day period begins to run with the entry of a final judgment. And because the finality of a judgment is negated by the timely filing of a motion under Rule 50(b), 52(b), or 59, we conclude that a Rule 54(d)(2)(B) motion is timely if filed no later than 14 days after the resolution of such a Rule 50(b), 52(b), or 59 motion.").

[46] See Cassell v. Colvin, No. CIV. 14-2128, 2015 WL 3657865, at *1 (W.D. Ark. June 12, 2015) ("While Plaintiff's motion was technically premature at the time of its filing, as of April 28, 2015, the motion is became timely. As such, we do not find it would be in the best interest of justice to dismiss the Plaintiff's motion right now, only to have him re-file this identical motion tomorrow.").

Complaints in this case. He was afforded ample time to get the facts straight. On January 17, 2013, Plaintiff filed his initial Complaint setting forth two claims of discrimination on the basis of age—one under the ADEA and a second under the PHRA—as well as a third claim alleging a violation of § 301 of the LMRA.[47] Plaintiff asserted all three claims against both Defendants.

On March 14, 2013, PPL moved to dismiss the Complaint.[48] Plaintiff responded by filing an Amended Complaint on April 15, 2013.[49] Plaintiff's Amended Complaint contained the same three claims, each alleged against both defendants, but included additional averments. On May 1, 2013, PPL moved to dismiss the Amended Complaint.[50] The Union moved to dismiss the Amended Complaint on June 11, 2013.[51]

On June 24, 2013, Plaintiff moved for leave to file a Second Amended Complaint. ECF No. 21, which this Court granted on June 13, 2014.[52] The Second Amended Complaint included the same three causes of action, but named PPL as the only defendant on the ADEA and PHRA claims.[53] Plaintiff maintained that both Defendants violated § 301 of the LMRA.[54] The Second Amended Complaint

_____

[47] ECF No. 1.
[48] ECF No. 8.
[49] ECF No. 14.
[50] ECF No. 16.
[51] ECF No. 20.
[52] ECF No. 25.
[53] ECF No. 27.
[54] Id.

also supplemented various averments in support of Plaintiff's theories.[55]

In its Memorandum granting Plaintiff leave to file his Second Amended Complaint, this Court made explicit that the factual allegations that saved Plaintiff's ADEA claim were those that accused PPL of affording Plaintiff "less favorable treatment in comparison with younger similarly situated coworkers."[56] The Court thus rooted its analysis in certain damning allegations in Plaintiff's Second Amended Complaint, such as that set out in Paragraph 31, where Plaintiff averred that "Defendant PPL has hired younger employees into similar positions that were doing the same amount of work," as well as that set out in Paragraphs 28 through 30,  where Plaintiff stated that he "was denied a remedy to his pay disparity and his requests for a new job classification were ignored"  because "Defendant had an illegal discriminatory motive for not rectifying these issues."[57] Without such factual allegations, this Court made clear that Plaintiff's age discrimination claim would otherwise be implausible and should instead be dismissed under Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal.[58] "This allegation," the Court observed, "makes Keister's charge of age discrimination plausible."[59]

Unfortunately, as the evidence would later illuminate, this Court was led

---

[55] Id.
[56] ECF No. 25 at 8.
[57] ECF No. 27 at 5.
[58] 550 U.S. 544 (2007); 556 U.S. 662 (2009).
[59] ECF No. 25 at 8.

down the garden path by Mr. Russo when it accepted his client's allegations in good faith. They turned out to be patently untrue, but Mr. Russo chose to plead them anyway in an attempt to prop up his client's deflated claim. For instance, Plaintiff would later reveal the following in his deposition:

> Q.    And if you turn to—if you look at number eight, you're requested to provide someone—describe who was in the same or similar situation as you and how they were treated. You didn't provide anybody that is similarly situated to you that was treated differently, correct?
>
> A.    Correct.
>
> Q.    Can you identify anybody who is similarly situated to you that is sufficiently younger that was treated differently than you?
>
> A.    No. And the reason being—that requires an explanation. Because I'm the only one at Susquehanna that ever did my job.
>
> Q.    You can't identify anybody who is similarly situated as you that that requested a job reevalution and that is sufficiently younger and provided with a job reevalution, can you?
>
> A.    No.
>
> Q.    You can't provide me with a name of anybody who was significantly younger than you that requested that PPL create a management job and they did so for them and they didn't do so for you, can you?
>
> A.    No.[60]

Moreover, as this Court pointed out in its Summary Judgment

Memorandum, Plaintiff , in direct contradiction to those previously emphasized

---

[60] ECF No. 39 Ex. 1 at 30.

statements in the Second Amended Complaint, later revealed that he "has younger electricians and foreman under his direct supervision that he has taken to training and given specific knowledge of the system."[61] That fact, the Court noted, seemed to suggest that, in practice, Plaintiff was treated better than his younger co-workers, a sort of de facto senior lead—a role that emerges organically in many contexts.

The Court, disposing of Plaintiff's ADEA claim in its Summary Judgment Memorandum, explained as follows:

> As the Court reads Plaintiff's Brief in Opposition to PPL's Motion for Summary Judgment, it seems to be the case that Plaintiff's core age discrimination theory is that his job classification and attendant salary did not reflect the type of tasks for which he was responsible at work. . . . Plaintiff alleges that despite his exemplary work ethic, "he was refused the chance to gain a management position that would reflect the duties and responsibilities he was already performing and reward him appropriately for the work he provided."
>
> The circumstances Plaintiff has described do not constitute age discrimination—in fact, they seem to have nothing to do with comparative ages among workers at PPL whatsoever. Instead, what Plaintiff has attempted to cast as age discrimination is nothing more than a permissible business judgment on PPL's part. Further, Plaintiff has provided no facts indicating that this business judgment was in any fashion linked to Plaintiff's age. In reality, Plaintiff's "age discrimination" claim would have been more appropriately addressed through the Collective Bargaining Agreement's prescribed procedures and later through the Union's grievance system. The Court wonders if perhaps Plaintiff felt compelled to plead an age discrimination claim based upon his failure to adequately pursue relief through those more

---

[61] ECF No. 50 at 44.

appropriate channels.[62]

What's more, Plaintiff admitted that the alleged mistreatment he had been suffering at PPL's had begun before he even turned forty and was in place at least as early as Plaintiff's thirty-ninth birthday. For example, on or about June 13, 1986, Plaintiff requested a job reevaluation due to his extensive experience with computers and related infrastructure—the same sort of request at issue on summary judgment.[63]

Plaintiff was thirty-nine (39) years-old at the time he made that request.[64] PPL took no action on Plaintiff's request at that time because Plaintiff never filed a formal complaint, charge, or grievance with the Union contesting this determination.[65] Unfortunately, as might seem obvious, ADEA plaintiffs are statutorily limited to those individuals who are "at least 40 years of age."[66] That's precisely because alleged mistreatment of individuals who are younger than 40 is presumed not to have been committed on the basis of age. Regardless, Mr. Russo plowed ahead with an age discrimination claim, on the basis of alleged mistreatment that had begun well before his client was even covered by the ADEA and based on a record that bore scant evidence of discriminatory animus.

The same wide gulf between the facts and Plaintiff's pleadings existed in

---

[62] ECF No. 54 at 42–43 (internal citations omitted).
[63] ECF 40, Ex. 3 at 4; ECF 50 at 30.
[64] ECF 40, Ex. 3 at 4; ECF 50 at 30.
[65] ECF 40, Ex. 3 at 4; ECF 50 at 30.
[66] 29 U.S.C. § 631(a).

relation to his § 301 LMRA claim. As the Court explained in its Summary

Judgment Memorandum, a § 301 hybrid LMRA is appropriate when the Plaintiff

alleges that an employer has breached its Collective Bargaining Agreement (CBA),

and the union has simultaneously breached its duty of fair representation.[67] As an

initial matter, Plaintiff simply offered no evidence that PPL breached the CBA

here. Based on a fair reading of the pertinent portion of Plaintiff's Second

Amended Complaint, the Court found it unclear how Plaintiff could even allege in

good faith that PPL's conduct ever amounted to anything even remotely similar to

a breach of the CBA. The Complaint merely alleged that "Defendant PPL was

notified on numerous occasions of the Plaintiff's pay disparity," and "failed to

properly re-evaluate the Plaintiff's increased job duties and necessity for job

description re-evaluation."[68] In reality, those allegations also diverged significantly

from the actual facts of the case.

As it turned out, Plaintiff, as a Union member, was party to a CBA with

PPL.[69] That CBA set forth a specific process to request a job reevaluation and

detailed the recourse available to employees who are dissatisfied with the results of

such a request.[70] In this regard, if a job reevaluation request is not approved, a

bargaining unit employee, such as Plaintiff, may appeal the decision. If the Union

---

[67] Id. at 12–13 (citing DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 165 (1983); Podobnik v. U.S. Postal Serv., 409 F.3d 584, 593 (3d Cir. 2005)).

[68] ECF No. 27 at 8.

[69] ECF 40, Ex. 3 at 5; ECF 50 at 30.

[70] ECF 40, Ex. 3 at 5; ECF 50 at 30.

and PPL still disagree, any bargaining unit employee could proceed by initiating the grievance process. It is undisputed in this case that Plaintiff never filed a grievance—a mandatory exhaustion requirement in the Third Circuit before a claimant may bring a federal lawsuit alleging a violation of § 301 of the LMRA.[71]

Specifically, Article VI, Section 1 of the CBA provides in pertinent part that:

> The Company will prepare new or eliminate old job titles and descriptions or otherwise revise or modify them when necessary to meet changed conditions. Requests for new jobs and requests for re-evaluation for existing jobs will be handled in accordance with Exhibit N.[72]

Under the heading "Existing Jobs," Exhibit N provides in pertinent part that:

> 1. A request to re-evaluate an existing job description may be initiated by an incumbent employee or appropriate supervisor.
>
> . . .
>
> 5. If the request is not approved by the Company, Bargaining Unit employees may appeal the decision to the IBEW Local 1600 office.
>
> 6. Disagreements between the Company and Local 1600 regarding whether to submit an existing position for re-evaluation shall be resolved through the grievance procedure.[73]

The Court's decision to grant summary judgment in favor of PPL on the § 301 hybrid LMRA claim was based on a straightforward proposition: PPL could

---

[71] Podobnik v. U.S. Postal Service, 409 F.3d 584, 594 (2005) (citing Vaca v. Sipes, 386 U.S. 171, (1967)) ("The Supreme Court instructs that, where a collective bargaining agreement establishes a grievance procedure, an employee must at least attempt to exhaust such a process.").
[72] ECF No. 40 Ex.4 at 66.
[73] ECF No. 40, Ex. 4 at 67–68.

not have breached the CBA because Plaintiff had simply never filed a grievance as it related to the instant dispute. There was never any union appeal, no formal grievance, and consequently no opportunity for PPL to breach any provisions of the CBA. Plaintiff provided no evidence to the contrary and failed to indicate how exactly PPL went about breaching the CBA under his theory. As the Court commented in its Summary Judgment Memorandum:

> Plaintiff has not offered sufficient evidence to create a genuine dispute of material fact as to whether PPL breached the CBA. In fact, based on the evidence in the record, the Court cannot fathom how any action by PPL might have even come close to a breach of the CBA. Plaintiff offers no facts indicating that PPL was in any way obligated to entertain his reclassification request other than the proper procedures governing such reconsiderations that were set forth in CBA itself—procedures, like the rest of those involved in this case, that Plaintiff chose never to commence. Because there are no genuine disputes of material fact that the Union did not breach its duty of fair representation or that PPL did not violate the CBA, summary judgment should be granted in favor of the Defendants on Plaintiff's § 301 claim on the basis of this second and distinct ground as well.[74]

As the United States Court of Appeals for the Fourth Circuit has concisely summarized, "To be reasonable, the prefiling factual investigation must uncover some information to support the allegations in the complaint. . . . That is, where there is no factual basis for a plaintiff's allegations, the complaint violates Rule 11's factual inquiry requirement."[75] Further, as several courts in the Third Circuit's venire have elaborated, "Rule 11 requires that an attorney who files a complaint

---

[74] ECF No. 54 at 35.
[75] Brubaker v. City of Richmond, 943 F.2d 1363, 1373 (4th Cir. 1991).

certify that there is a reasonable basis in fact and law for the claims."[76]

As has become evident, the allegations in Plaintiff's Second Amended Complaint were unsupported at the time that Mr. Russo wrote them, and were unlikely to ever gain factual support during the course of discovery, because they simply were inaccurate. More troubling, this reliance on supported factual allegations was not accidental. Considering the pertinent factors set out by the Third Circuit, this was not a case where counsel lacked time to make a proper inquiry, where a client perjured testimony, or where counsel had to rely on some other unproven source of information. The weak basis for Plaintiff's lawsuit was clear from the start, and very little could have altered its failing trajectory. The claims simply had no basis in fact, yet Plaintiff nevertheless chose to advance them.

**C.    Rule 11 Sanctions Are Warranted Because The Claims In Plaintiff's Second Amended Complaint Were Not Warranted By Existing Law Or By A Nonfrivolous Argument For Extending, Modifying, Or Reversing Existing Law Or For Establishing New Law.**

Mr. Russo's papers filed in response to Defendants' Summary Judgment, Rule 11, and Fees Motions amounted to nothing more than a collage of sundry employment discrimination principles, whose application to the case at hand was unclear and tenuous at best. As Judge Mariani observed in his Rule 11

---

[76] <u>Soo San Choi v. D'Appolonia</u>, 252 F.R.D. 266, 271 (W.D. Pa. 2008). <u>See also</u> <u>Leuallen v. Borough of Paulsboro</u>, 180 F. Supp. 2d 615, 618 (D.N.J. 2002).

Memorandum earlier this year that sanctioned Mr. Russo, "Plaintiff devotes much of his Brief to identifying the standard for determining whether sanctions should be granted under Rule 11, but offers little to show why sanctions should not be granted in this case."[77] The Court could make the same observation about Mr. Russo's papers and oral argument in this matter. Mr. Russo, during his oral presentation before the Court, was particularly unapologetic and unwilling to accept any responsibility for the trouble he and his client had brought upon the Defendants.

Even more troubling than the non-responsive nature of Mr. Russo's submissions is the fact that they appear intentionally vague and calculated to raise disputes of law or fact where none existed. In addition to Mr. Russo's questionable factual claims outlined earlier, his papers cite to cases and propositions whose applicability to the case at hand is highly questionable and often inaccurate. Moreover, just like his questionable factual assertions, Mr. Russo's indiscriminately quotes to random doctrine in a "see what sticks" approach to briefing, which often resulted in nothing more than utter confusion for the Court and the Defendants. Consequently, both were left to expend unnecessary time and effort dissecting Mr. Russo's strategically placed, yet baseless arguments. Unfortunately, as the Court and the Defendants unraveled this case, it became

---

[77] <u>Moore v. Air Methods, Inc.</u>, No. 3:14-CV-0684, 2015 WL 4590988, at *2 (M.D. Pa. July 29, 2015).

patently clear that Plaintiff's case was nothing more than an illusion, one supported by baseless factual contentions and inapplicable legal conclusions proffered by Mr. Russo. Regrettably, it took significant time to come to that realization because Mr. Russo impeded its discovery at every juncture.

Take two prime examples outlined in this Court's Summary Judgment Memorandum. The first is that Plaintiff's age discrimination claim had no colorable legal basis. Plaintiff contended that he was discriminated against on the basis of his age because he was not promoted and his job was not reevaluated or reclassified.[78] At the same time, Plaintiff's papers failed either to explain how PPL's alleged refusal to adjust his job description was "because of" age discrimination or alternatively, to cite to any legal authority suggesting that discriminatory animus could be inferred absent any indication that PPL favored younger workers or reevaluated younger workers in a disproportionate manner. Neither was Mr. Russo able to identify any such legal authorities at the Rule 11 oral argument.

Plaintiff's Rule 11 response brief would later bluntly claim that "[t]his is a reduction in force case."[79] Accordingly to Plaintiff, that is because PPL's failure to reevaluate was an attempt to force Mr. Keister to retire. Again, the Court is left bereft of any legal authority or factual backing for that proposition. It is also a

---

[78] See ECF No. 27 at 5–6.
[79] ECF No. 41 at 12.

rather inventive twist, appearing for the first time in the Rule 11 briefs rather than in the Second Amended Complaint. To account for the utter absence of discriminatory motive, Mr. Russo in his Rule 11 brief cites to Pivirotto v. Innovative Sys., Inc., seeking support for the proposition that "the Third Circuit eliminated the replacement requirement in the context of a categorical classification claim (race, sex, disability, national origin)."[80] However, Mr. Russo again leaves the Court to wonder: what exactly are the consequences of that proposition? Does it even apply to this case?

In fact, Pivirotto was a Title VII sex-discrimination disparate treatment case—not an ADEA case brought under similarly questionable circumstances as here.[81] Nevertheless, a careful reading of Pivirotto reveals that its core holding is not evisceration of the discrimination requirement in age discrimination cases, but rather the following proposition: "the fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant [to the prima facie case], so long as [s]he has lost out because of [her gender]."[82] The Pivirotto Court explained that although replacement by a man was not a pre-requisite for a woman to bring a Title VII sex-discrimination claim, the plaintiff still must adduce "evidence adequate to create an inference that an employment decision was based

---

[80] Id. at 13 (citing 191 F.3d 344 (3d Cir. 1999).
[81] Pivirotto, 191 F.3d at 355.
[82] See id. at 355 (quoting O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996)) (emphasis added).

on an illegal discriminatory criterion."[83]

It is clear then that although replacement is not a necessary requirement to bring a sex discrimination claim, some minimal evidence of discrimination must still be proffered. Mr. Russo quotes sound bites from Pivirotto instead in an attempt to support his legal contention that "a plaintiff is not even required to show other similarly situated employees outside the relevant class were treated more favorable."[84] Again, though that statement likely strains the far outer bound of what Pivirotto stands for, Mr. Russo has left the Court with nothing in this case, simply no evidence of age discrimination. The Pivirotto Court eliminated the narrow requirement that the plaintiff be replaced by a non-member of the protected class. It did not eliminate the need for the plaintiff prove discriminatory animus based on age whatsoever, as Plaintiff here failed to do.[85] Thus, there clearly must be some sufficient indication that Plaintiff was discriminated against because of his age. As the Court explained in its Summary Judgment Memorandum:

> "To prevail on an intentional age discrimination claim under either the ADEA or the analogous provision of the PHRA, a plaintiff must show that his or her age actually motivated or had a determinative influence on the employer's adverse employment decision." Fasold v. Justice, 409 F.3d 178, 183-84 (3d Cir. 2005) (internal citations and quotations omitted).

---

[83] Pivirotto, 191 F.3d at 356 (quoting O'Connor, 517 U.S. at 312).

[84] ECF No. 41 at 13.

[85] Pivirotto, 191 F.3d at 355 ("We can find no justification for limiting the proof necessary to create this inference to the potentially irrelevant and only marginally probative fact that she was (or was not) replaced by a man.").

. . .

> The circumstances Plaintiff has described do not constitute age discrimination—in fact, they seem to have nothing to do with comparative ages among workers at PPL whatsoever.[86]

This is just one example of Mr. Russo's many unclear contentions in this case, which have littered his papers and left the Court and Defendants wasting time chasing unavailing leads and tumbling down legal rabbit holes. Though not necessarily wholly spurious, these types of disconnected legal contentions simply have done more to bewilder the Court and lead it astray than to promote resolution.

Another glaring example of Mr. Russo's reliance on questionable legal authority is his appeal to the so-called "continuing violation theory" to both support his claim and excuse this case's severe timeliness defects. In essence, Mr. Russo erroneously cross-referenced law pertaining to the statute of limitations with those going both to exhaustion requirements and the merits of a discrimination claim. The "continuing violation theory" is a means by which claimants may "reach back" and recover for certain unlawful employment practices that occurred before the statutory period, so long as the appropriate indicia of a continuing violation are present.[87] Thus, it is at heart a procedural rule that effectively enlarges the limitations and recovery periods. It is not, however, a distinct substantive claim. Consequently, it cannot be employed by counsel, as here, to satisfy the

---

[86] ECF No. 54 at 40–42.

[87] See Metsopulos v. Runyon, 918 F.Supp. 851, 858 (D.N.J. 1996); National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110–18.

requirements of an age discrimination claim by stringing together and artificially augmenting a serious of discrete employment decisions that on their own would not constitute independent violations of the ADEA. Such conduct simply raises the negative inference that Mr. Russo and his client have attempted to circumvent timeliness defects by twisting established legal doctrine in an unwarranted ways.

As one federal court in the Third Circuit's venire has explained, "[t]he 'continuing violation' theory merely affects the time available to a complainant to file the charge with the agency or EEOC."[88] The "continuing violation" theory does not "excuse[ ] the exhaustion requirement."[89] Later on, the Third Circuit would clarify that to invoke the continuing violation theory, a plaintiff must "allege [a] specific act of discrimination that occurred within the statute of limitations period."[90] A plaintiff cannot "seek[ ] to invoke the continuing violation doctrine to resurrect his now moribund claims."[91] Thus, a plaintiff "cannot revive his time-barred allegations of discrimination or hostile work environment without alleging at least one specific, timely violation."[92] Mr. Russo's filings have run afoul of this established body of law.

In fact, as the Supreme Court has already explained in a similar case, "[m]ere continuity of employment, without more, is insufficient to prolong the life

---

[88] Metsopulos, 918 F.Supp. at 858.
[89] Id. at n.2.
[90] Snyder v. Baxter Healthcare, Inc., 393 F. App'x 905, 909 (3d Cir. 2010).
[91] Id.
[92] Id.

of a cause of action of employment discrimination."[93] Quite the opposite,

"[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal

to hire are easy to identify."[94] Thus, "[e]ach incident of discrimination and each

retaliatory adverse employment decision constitutes a separate actionable

'unlawful employment practice.'"[95] Again, Mr. Russo would have otherwise.

In a confounding fashion, Mr. Russo's papers on this particular issue

attempted to lead the Court to misapply this precedent. According to Mr. Russo,

"[i]n the case at bar, there is no single 'moment' of discrimination to neatly pin

down a timeline."[96] Recall that Mr. Russo made this claim after indicating that the

case at bar essentially involved age-based failure to promote. The next sentence in

Mr. Russo's brief reads: "There is no longer a 'permanency' requirement to

establish a continuing violation."[97] Again, although that statement is not untrue,

these types of broad legal contentions by Mr. Russo that have no applicability to

the present case left the Court and Defendants completely exasperated.

The relevance of such legal principles to this case was exceedingly

questionable. The underlying wrong was a failure to reevaluate or reclassify

Plaintiff's position. At no time did Plaintiff allege that anyone at PPL called him

names unbecoming of older employees, criticized him because of his age, or

---

[93] Morgan, 536 U.S. at 112–13.
[94] Id. at 114.
[95] Id.
[96] ECF no. 50 at 13.
[97] Id.

otherwise behaved with any hostility toward him due to the fact that Plaintiff was older than forty. Yet, Mr. Russo would attempt to excuse his client's failure to exhaust the prescribed grievance procedures as well as his failure to sue in a timely manner after receiving his right-to-sue notice by instead appealing to the Third Circuit's "continuing violation" doctrine.

Much like Mr. Russo's other legal contentions, this one was simply wrong and inapplicable. There are two significant problems that prohibit the implementation of a "continuing violation" theory here. First, as discussed in the case law outlined above, application of a continuing violation is largely a procedural device meant to enlarge the statute of limitations. It does not ameliorate failures by a party like Plaintiff here to exhaust all necessary administrative remedies or to file a federal lawsuit in the appropriate window upon receiving a right-to-sue letter.

Second, and perhaps even more troubling, there was nothing in this case to suggest application of a "hostile workplace environment" construction—the type of claim for which the Supreme Court has so often reserved the continuing violation theory. As the Court wrote in <u>Morgan</u>, the statute of limitations begins running on "discrete" actions (such as those at issue here) at the time of their occurrence.[98] When dealing with discrete instances of discrimination, that

---

[98] <u>See</u> <u>Morgan</u>, 536 U.S. at 110.

approach is an obvious way for courts to answer an "eas[y] question."[99] To the

contrary, "[h]ostile environment claims are different in kind from discrete acts."[100]

"Their very nature involves repeated conduct," which "occurs over a series of days

of perhaps years."[101] Thus, application of the continuing violation theory, though

appropriate in certain cases, was wholly misplaced here.

Defendants perhaps summed up this glaring mistake most clearly, when they

pointed out that Plaintiff's version of the doctrine relies "upon some convoluted

and conjured 'hostile work environment' allegations," inapplicable because the

Union's decisions at issue here were "discrete" rather than "continuous" events.[102]

Mr. Russo has never offered an adequate explanation for his baffling pleadings and

argumentation.

Such inapplicability was evident from the cases that Plaintiff purported to

cite in support of its legal contentions. Upon closer reading, Plaintiff should have

discovered that neither of the two cases it cited involved discrete acts of age

discrimination. In fact, one of the two cited cases refused to apply the continuing

violation theory to discrete tort claims.[103] As the district court in Rankin v.

---

[99] See id.

[100] Id. at 115.

[101] Id.

[102] See ECF No. 51 at 11 n.3; ECF No. 53 at 2.

[103] See Mandel v. M & Q Packaging Corp., 706 F.3d 157, 165 (3d Cir. 2013) (quoting Morgan, 536 U.S. at 115–17) ("A hostile work environment claim 'is composed of a series of separate acts that collectively constitute one unlawful employment practice' and 'cannot be said to occur on any particular day.'").

Smithburger, one of the cases upon which Mr. Russo purported to rely, observed:

> Under the facts here, it is plain that the alleged wrongs committed by Defendants prior to September 21, 2010, namely seizures of property and entries into the home, were sufficiently "discrete." They occurred over a short period of time and were easily identifiable by the victim, and indeed Plaintiff alleges that she watched them occur and tried to prevent them. Each act would have constituted an independent tort, complete when the property had been unlawfully seized or when the home had been unlawfully searched. They do not constitute the type of non-discrete acts, like a hostile work environment, for which a plaintiff may take advantage of the continuing violations doctrine. Therefore, the only underlying claims that survive are those surrounding the events on or after September 21, 2010, and all claims relying on events beforehand are dismissed with prejudice.[104]

Finally, the Court notes that Mr. Russo also failed to offer any explanation as to these legal or factual shortcomings during the parties' Rule 11 hearing. Rather astonishingly, Mr. Russo attempted to liken this case to one of his previous matters in which the Honorable Gene Pratter of the United States District Court for the Eastern District of Pennsylvania purportedly complimented him on his "novel" theories. There is nothing "novel" about the ADEA and the type of claim alleged here, and the theories that Mr. Russo has conjured up in his papers in this case have not been motivated by novelty or creativity but by a desire to confuse the Court and the parties, to shroud the straightforward weaknesses of his client's claim, and to manufacture disputes where none existed.

---

[104] No. 2:12-CV-01373, 2013 WL 3550894, at *6 (W.D. Pa. July 11, 2013).

### D.   Rule 11 Sanctions Are Warranted Because Plaintiff's Denials Of Factual Contentions Were Unwarranted On The Evidence Were Not Reasonably Based On Belief Or A Lack Of Information.

Rule 11 Sanctions are also warranted in the instant matter because Mr. Russo failed to respond to certain of Defendants' Statements of Undisputed Material Facts, a tactic that needlessly prolonged and complicated the Court's disposition of Defendants' Motions for Summary Judgment. Specifically, Mr. Russo refused to answer certain of Defendants' factual averments, an exchange required by Middle District of Pennsylvania Local Rule 56.1. That rule provides as follows:

> A motion for summary judgment filed pursuant to Fed.R.Civ.P.56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.
>
> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.
>
> Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.
>
> All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

There were two significant shortcomings with Mr. Russo's responses to Defendants' two Statements of Undisputed Material Facts in this case. First, he outright failed to answer the Union's Statement of Undisputed Material Facts.

Although he claimed during the oral argument held before the Court that his responses to PPL's Statement of Undisputed Material Facts covered largely the same substance as that which he would have addressed in a response to the Union, Mr. Russo's explanation does not excuse his noncompliance and is only partially correct in the Court's view regardless. If Mr. Russo was prepared to haul two distinct entities into federal court over Mr. Keister's circumstances, he should have been prepared to adequately respond to both Defendants' papers. He also could have spoken with counsel for Defendants to arrange an amicable agreement before choosing simply to disregard the Local Rules on his own.

Second, even when he did put a response in writing, Mr. Russo, on at least three separate occasions, refused to admit or deny certain statements of PPL's on the basis of a non-existent evidentiary privilege. The averments to which Mr. Russo failed to respond were critical to the disposition of this case and unnecessarily complicated its resolution on summary judgment even further. As the Court outlined in its Summary Judgment Memorandum:

> In this case, Plaintiff appears to base his LMRA claim on two purported omissions by Defendants: failure to convert his bargaining unit position to a managerial one (Plaintiff's "reclassification" theory) and failure to properly reevaluate his position (Plaintiff's "reevaluation" theory). See ECF No. 27 at 7–9. A threshold factual issue that has affected the Court's disposition of this claim is the extent to which these two alleged omissions are truly distinct. . . . The consequences of this lack of clarity on Plaintiff's part have become increasingly evident as this case has progressed, especially during Plaintiff's own deposition and throughout the briefing. See, e.g., Local

1600's Br. in Supp. of Mot. for Summ. J. at 11–12, ECF No. 44 (employing conditional statements to defendant against various hypothetical case theories).

This confusion was further complicated by Plaintiff's opaque response to Defendant PPL's Statement of Undisputed Facts #24, #47, and #71 that Federal Rule of Civil Procedure 56(c)(2)(B) bars him from fully responding and clarifying this and the related issue of Defendant's alleged discriminatory motives. ECF No. 50 at 30, 32, and 34. In fact, the Court notes that Rule 56(c)(2)(B) does not exist, and even if it did, this Court would certainly not exclude a Plaintiff's prime evidentiary justification for his claims as inadmissible "opinion." Further, this Court cautions that refusing to supply such critical backing for one's claim may warrant a negative inference that such evidence is nonexistent.[105]

The law on such Rule 11 violations is clear. "Any competent attorney would have made such an investigation, as required under Rule 11 to determine the accuracy of the statements of undisputed facts, the law, and grounds for objections."[106] Where an attorney fails to conduct the mandated Rule 11 inquiry into the validity of such contentions, especially where the resulting output is "inaccurate and misleading," that violates the attorney's "duty of truth and candor to the Court" and "amount[s] to obstruction of the just resolution of the case and harassment."[107] Unfortunately, Mr. Russo's conduct ran counter to this clear doctrine.

---

[105] ECF No. 54 at 14–15. See also O'Connell v. Associated Wholesalers, Inc., 558 F. App'x 286, 291 (3d Cir. 2014) ("Here, the requirement to file a separate statement responsive to AWI's statement of undisputed facts was consistent with Federal Rule of Civil Procedure 56(c), which provides, in relevant part: 'A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record ... or ... showing that the materials cited do not establish the absence or presence of a genuine dispute....'").

[106] Moser v. Bret Harte Union High Sch. Dist., 366 F. Supp. 2d 944, 979-80 (E.D. Cal. 2005).

[107] Id.

Mr. Russo, here, implanted uncertainty and ambiguity into the factual

posture of this where no such vagueness was warranted and where such

inconsistencies were often contradicted by Mr. Keister's own deposition testimony.

As PPL concisely put it: "[Mr. Russo] has used the foregoing response in a bald

attempt to avoid admitting facts which would render his case baseless and

frivolous."[108] For instance, Plaintiff refused to respond to PPL's contention that he

suffered from the same form of discrimination before he attained age forty. PPL's

Undisputed Statement of Fact #47 alleged as follows:

> 47. Plaintiff testified that he believes that PPL's failure to create a
> management-level position for him in 2000 was based upon his age
> and is the same exact complaint he has had since 1986. Exhibit A, pp.
> 36-37, 84-85, 107-108 and 121-122.[109]

Plaintiff refused to answer that averment, noting:

> 47. Denied as the balance of Defendant's SUMF Paragraph 47
> violates the proscription set forth in F.R.C.P. No. 56 (c) (2) (B) by
> including statements of opinion not supported by the record and
> therefore not admissible at trial.[110]

To the contrary, Plaintiff's deposition testimony indicated as follows:

> Q.   All right. And how old were you in – as of June 13th,
>       1986?
>
> A.   I was 39. Turned 40 in December.
>
> Q.   So as of June 13th, 1986, you were 39 years old?

---

[108] ECF No. 51 at 2.
[109] ECF No. 40 Ex. 3 at 7.
[110] ECF No. 50 at 32.

A.     Yes.

Q.     What happened with this job reevaluation?

A.     Nothing.

Q.     Do you believe that was based on your age?

A.     Yes.

Q.     So as of June 13th, 1986, you believe that PPL was discriminating against you because of your age when they failed to take action with this job evaluation?

A.     Correct.[111]

Most troubling, Plaintiff used such denials to manufacture ambiguity that wholly slowed the summary judgment process. At times, both Defendants were forced to argue in the alternative and employ conditional statements, because the primary theory behind Plaintiff's lawsuit was intentionally vague and incomplete. Not to mention, Plaintiff's tactics also added significantly more work, where a more direct approach was possible and would have sufficed. For these reasons, Mr. Russo's baseless responses (or lack thereof) to Defendants' Statements of Undisputed Facts are a third and independent reason why the Court believes Rule 11 Sanctions are warranted.

---

[111] ECF No. 40 Ex. 4 at 36.

**E.      Rule 11 Sanctions Are Warranted Because Plaintiff's Second Amended Complaint Was Presented For Several Improper Purposes, With The Intent To Cause Unnecessary Delay, And To Needlessly Increase The Cost Of Litigation.**

Upon review of the parties' papers and the Rule 11 Sanctions hearing held before the Court, it has become patently clear that the purpose of this litigation was to extort a settlement from Defendants on meritless facts and to otherwise run up the cost of litigation for opposing counsel.

First, it has become apparent that a primary goal of Mr. Russo's in bringing this litigation was to attain a settlement to which his client was not rightfully entitled. As Mr. Russo argued in his opposition brief to PPL's Rule 11 Sanctions Motion, imposition of sanctions is unwarranted because "PPL has willfully failed to participate in mediation."[112] If only bringing extortionate litigation was that easy. Accepting Mr. Russo's argument would grant unscrupulous plaintiffs lawyers everywhere the go-ahead to file baseless claims and then compel mediation. To the contrary, mediation—at least productive mediation—anticipates the existence of a claim with at least some merit. The Court finds absolutely no fault in PPL's decision to not mediate Mr. Keister's claim. To do so would simply have been irrational.

Unsurprisingly, like most of Mr. Russo's contentions, he chose to tell the Court only half the story when he made his mediation argument. In fact, as counsel

---

[112] ECF No. 41 at 5.

for PPL points out, its client never refused to participate in mediation. What actually transpired was that on September 10, 2014, counsel for PPL emailed the assigned mediator to express concerns related to the timing of an upcoming mediation session.[113] PPL's counsel wrote: "Based on our conference with Judge Brann, it is my understanding that a mediation would not occur until after Plaintiff's deposition was taken. I am respectfully requesting that any mediation be scheduled for November to allow the parties time to take Plaintiff's deposition."[114] That was the only approach that makes sense here. It is unclear whether Mr. Russo simply believed that his papers would not be checked for accuracy, but as should now be evident, this Court thoroughly reviews the record, the cited authorities, and the parties' arguments in every dispute that comes before it.

This extortive purpose was evidenced by the many ambiguities that Mr. Russo manufactured in an attempt to pass his complaints through the motion to dismiss stage and to create genuine disputes of material fact on summary judgment. Although its impact on Defendants was made clear above, it is also worthwhile to consider the societal costs that such meritless litigation necessarily imposes, particularly in those cases involving utilities like PPL. In the long run, for example, it is not difficult to anticipate how the aggregate costs of litigation demanded from a company like PPL may eventually result in higher rates for

---

[113] ECF No. 43 at 4.
[114] ECF No. 43 Ex. 1 at 2.

electricity provision and other consumer services. In essence, one might even conceptualize a forced settlement by PPL of meritless litigation as a transfer payment from society to Mr. Russo and his client. In this instance, that is not a burden the public was rightly meant to shoulder.

*    *    *

When it comes to the parties' motives, there is a final point of contention that has been on this Court's mind since its sanctions hearing. During the course of the hearing, Mr. Russo suggested that Steven E. Hoffman, Esquire, counsel for PPL, chose to bring his client's Rule 11 Sanctions Motion out of some misplaced personal vendetta against Mr. Russo. Rule 11 Sanctions were clearly warranted here, and based upon the time it has now taken this Court to sift through Mr. Russo's misleading papers yet again, I am only more convinced of the appropriateness of those sanctions.

No aspect of this litigation has even slightly suggested to the Court that Mr. Hoffman for PPL or, for that matter, Quintes D. Taglioli, Esquire, for the Union ever harbored any improper motives for bringing their clients' instant motions. Quite the opposite, in comparison to Mr. Russo's research, submissions, and oral presentation before the Court, Mr. Hoffman and Mr. Taglioli clearly did their homework and were both entirely more prepared and accurate. In fact, Mr. Hoffman's and Mr. Taglioli's papers and oral advocacy were both exceptionally

42

strong. Their body of work in this matter has signified that they are both nothing

less than upstanding officers of the Court. Accordingly, coming from an advocate

who has amassed a rather problematic history, Mr. Russo's ad hominem attacks on

opposing counsels' character carried no weight in my eyes.

### F.   Due To Mr. Russo's Repeated Rule 11 Violations And His Otherwise Vexatious Litigation History, Reasonable Attorney's Fees Are "The Minimum That Will Serve To Adequately Deter Undesirable Behavior."[115]

Federal courts in the Third Circuit's venire and the Advisory Committee

Notes to Rule 11 have set forth certain factors useful in determining the

appropriate sanction for a violation of Rule 11. They include:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants: all of these may in a particular case be proper considerations.[116]

In the Court's view, an award of reasonable attorney's fees for the entirety

of this litigation is the least severe means necessary here to forestall Mr. Russo's

---

[115] Doering, 857 F.2d at 194.

[116] Fed. R. Civ. P. 11 Advisory Committee Notes to 1993 Amendment. See also In re Cendant Corp. Derivative Action Litig., 96 F. Supp. 2d 403, 407-08 (D.N.J. 2000). Because it will impose monetary sanctions, the Court must also consider the Doering factors as set forth at 857 F.2d 195–97.

consistently vexatious litigation tactics. Considering all of the factors set forth by the Third Circuit, this Court offers the following observations. First, it is apparent that Mr. Russo's conduct in this litigation was willful. The defects in his filings and the underlying weakness of his substantive claims were reminiscent of several of his previous actions. Moreover, the shortcomings evident in Plaintiff's case were the result of purposeful choices, not negligence or recklessness. Second, as emphasized throughout, Mr. Russo's conduct was reflective of his larger pattern of litigation and was not an isolated incident. Perhaps most importantly, the factual inconsistencies in the Second Amended Complaint and the denials of certain of Defendants' undisputed material facts "infected the entire pleading" and necessarily tainted the entire litigation as a whole from beginning to end.

The Court finds it instructive to address the following potential counterargument: If the underlying case was so meritless, why did Defendants require such extensive time and effort to bring it to resolution? The answer is that Mr. Russo, at several junctures already enumerated, consistently disguised the fatal flaws of his client's claims by furthering unsupported factual allegations and failing to adequately address Defendants' factual contentions. This was a case built largely on Mr. Russo's posturing, the consistent filing of pleadings, which amounted to nothing more than bluffs that Defendants here were not afraid to call. That the underlying claims were meritless was known to at least one person: Mr.

Russo. Yet, he chose to conceal his case's weaknesses rather than litigate in good faith. Had Defendants not been forced to deal with Mr. Russo's circuitous and less than straightforward pleadings, this litigation would have ended long ago. Because the frivolous nature of the underlying claims was concealed by Mr. Russo, Defendants are entitled to the reasonable attorney's fees in the full amount of those fees incurred defending the entire case. That is because the entire case was enabled by Mr. Russo's violations.

Continuing to apply the Third Circuit's factors to this case, Mr. Russo has engaged in similar conduct in other litigation, namely as recent as this year. In fact, as outlined earlier, Mr. Russo filed his opposition briefs to Defendants' Motions for Summary Judgment during the same week in which Judge Mariani sanctioned him for what essentially amounted to the same improper conduct in a related employment discrimination lawsuit. The intent and effect of Mr. Russo's conduct was to waste the Defendants' monetary resources as well as their time and had largely the same impact on this Court. Mr. Russo is trained in the law, and this was not a case of perjured testimony or unclear facts. A reasonable inquiry would have put Mr. Russo on notice that this claim should not have been brought. Because the Rule 11 violation here infected the litigation as a whole, reasonable attorney's fees for the entire litigation is the appropriate sanction to adequately deter Mr. Russo specifically and other attorneys generally under similar circumstances.

This decision is consistent with precedent involving repeat Rule 11 offenders. "For filing a frivolous lawsuit, [a district court] would normally award attorney's fees and costs incurred by defendants in defending the suit and in bringing the Rule 11 motion."[117] Moreover, in her 2009 decision to sanction Harrisburg, Pennsylvania attorney Don A. Bailey for repeated Rule 11 violations, then Chief Judge Yvette Kane of this Court noted that several important but "troubling" factors that often warrant imposition of more severe sanctions, such as reasonable attorney's fees, include: (i) "the many times that [the offending attorney] has already been sanctioned for similar conduct in this and other courts"; (ii) the extent to which resolution of the  dispute "has also taken a lot of additional time and effort, both for [the parties] and the Court"; and (iii) the extent to which the filings or proceedings "have devolved into fractiousness."[118]

As the United States Court of Appeals for the District of Columbia Circuit has insightfully commented in regard to Rule 11 cases that warrant monetary sanctions:

> Rule 11 serves a dual purpose: punishment and deterrence. . . . When groundless pleadings are permitted, the integrity of the judicial process is impaired. Additionally, as borne out by this case, litigation abuse embroils the judiciary in needless satellite litigation. The monetary award here may be small, but even such a humble

---

[117] Matthews v. Freedman, 128 F.R.D. 194, 203 (E.D. Pa. 1989), aff'd, 919 F.2d 135 (3d Cir. 1990) (ordering monetary sanction, written reprimand, and referral to Pennsylvania Supreme Court Disciplinary Board for "publicly documented history of attorney['s] repeated misconduct").

[118] Lease v. Fishel, No. CIV.A 1:07-CV-0003, 2009 WL 922486, at *10 (M.D. Pa. Apr. 3, 2009).

investment in guaranteeing the proper functioning of our judicial process will reap great dividends.[119]

This Court believes that the factors enumerated above all weigh in favor of an award of reasonable attorney's fees and that imposition of such fees is the least means necessary to curb Mr. Russo's history of vexatious employment discrimination lawsuits. Furthermore, the investment made by Defendants and this Court in prosecuting and disposing of the instant motions is, as the District of Columbia Circuit observed, a worthwhile investment in the efficient functioning of federal litigation in this District.

In <u>Doering v. Union Cty. Bd. of Chosen Freeholders</u>, the Third Circuit also set forth several additional factors for district courts to consider when deciding upon the appropriateness and amount of an award of reasonable attorney's fees for a Rule 11 violation. Those factors include as follows:

> [T]he sanctioned party's ability to pay; [whether the attorney] has already been subject to adverse press scrutiny as a result of the sanction by the district court; [whether the attorney] has been subject to at least one other disciplinary action; [whether] any other evidence [ ] would tend to substantiate [the attorney's claim that he has already been deterred sufficiently from filing frivolous actions; the attorney's history of filing frivolous actions or alternatively, his or her good reputation; the defendant's need for compensation; the degree of frivolousness; whether the frivolousness also indicated that a less sophisticated or expensive response [by the other party] was required; and the importance of not discouraging particular types of litigation which may provide the basis for legislative and executive ameliorative

---

[119] <u>Westmoreland v. CBS, Inc.</u>, 770 F.2d 1168, 1180 (D.C. Cir. 1985).

action when the courts lack power to act.[120]

An important <u>Doering</u> factor to consider here is Mr. Russo's ability to pay an award of attorney's fees. At the sanction hearing before the Court, Mr. Russo indicated that, as a sole practitioner, an award of fees would severely hamper his ability to practice. Even given that suggestion, the Court is of the opinion that Mr. Russo's alleged financial circumstances simply do not outweigh the need for adequate deterrence in this case. If Mr. Russo was concerned with the propensity of a large fee award hindering his financial circumstances, then the prudent choice would have been to review his cases with greater care and to proceed only with those that had merit. The prudent choice was not to file an opposition brief in a very similar case to the one in which he was publicly reprimanded just one week earlier. Moreover, Judge Mariani in his decision to publicly reprimand Mr. Russo afforded him leniency because of his status as a sole practitioner. Thus, it is this Court's view that Mr. Russo has already been granted as full consideration as possible under the "ability to pay" <u>Doering</u> factor. That factor, however, cannot be wielded by sole practitioners as immunity against Rule 11 sanctions <u>ad infinitum</u>.

Applying the remaining <u>Doering</u> factors, Mr. Russo has not been subject to any adverse scrutiny in the press as a result of this case at this time to the Court's knowledge. He has, however, already been subject to a Rule 11 sanction in the

---

[120] 857 F.2d 191, 195-97 (3d Cir. 1988). <u>See also</u> <u>Zuk v. Eastern Pennsylvania Psychiatric Institute</u>, 103 F.3d 294 (3d Cir.1996) (Rosenn, J.).

form of public reprimand in a related case—a sanction, which evidently had little effect to deter Mr. Russo from filing similarly baseless claims. Defendants in this case are also deserving of compensation because the entirety of the litigation resulted from Mr. Russo's meritless filings. As detailed earlier, despite the frivolous nature of the underlying claim, significant time and effort was required by Defendants and this Court to dispose of the claim and to reveal its underlying weaknesses due to Mr. Russo's deliberate efforts to conceal those flaws. Finally, the Court does not believe that sanctioning Mr. Russo for making frivolous filings will negatively impact meritorious employment discrimination cases. As in Lease v. Fishel, these "equitable factors . . . tilt decidedly against" Mr. Russo."[121] Consequently, upon taking into consideration all of the Third Circuit's enumerated factors, this Court deems an award of reasonable attorney's fees the appropriate Rule 11 sanction here.

**G.   The Union Is Also Entitled To Reasonable Attorney's Fees Because Mr. Russo "Acted In Acted In Bad Faith, Vexatiously, Wantonly, Or For Oppressive Reasons" And Because Defendants Necessarily Shared The Burden Of Defending The LMRA § 301 Hybrid Claim.[122]**

"[T]he so-called 'American Rule' prohibits fee shifting in most cases."[123]

The Supreme Court of the United States has, however, carved three primary

---

[121] Lease v. Fishel, 712 F. Supp. 2d 359, 385 (M.D. Pa. 2010), aff'd, No. 1:07-CV-0003, 2010 WL 4318833 (M.D. Pa. Oct. 22, 2010).
[122] Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 258–59 (1975).
[123] Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991) (quoting Alyeska, 421 U.S. at 259).

exceptions to the American Rule. The applicable exception here is that "a court

may assess attorney's fees when a party has 'acted in bad faith, vexatiously,

wantonly, or for oppressive reasons.'"[124] The Supreme Court described the

contours of this exception in <u>Chambers</u>, explaining:

> In this regard, if a court finds that fraud has been practiced upon it, or
> that the very temple of justice has been defiled, it may assess
> attorney's fees against the responsible party, as it may when a party
> shows bad faith by delaying or disrupting the litigation or by
> hampering enforcement of a court order. The imposition of sanctions
> in this instance transcends a court's equitable power concerning
> relations between the parties and reaches a court's inherent power to
> police itself, thus serving the dual purpose of vindicating judicial
> authority without resort to the more drastic sanctions available for
> contempt of court and making the prevailing party whole for expenses
> caused by his opponent's obstinacy.[125]

The Third Circuit has applied this exception to hybrid claims brought

pursuant to § 301 of the LMRA. Specifically, in the context of litigation brought to

vacate arbitration awards under § 301, the Third Circuit has stated:

> Under the American rule, each party normally must bear the burden of
> its own legal expenses, including attorneys' fees. One of the narrow
> exceptions to this rule is a finding that the losing party litigated in bad
> faith, vexatiously, or for oppressive reasons.[126]

---

[124] <u>Chambers</u>, 501 U.S. at 45 (quoting <u>Alyeska</u>, 421 U.S. at 259). <u>See also</u> <u>F. D. Rich Co. v. U. S.</u>
<u>for Use of Indus. Lumber Co.</u>, 417 U.S. 116, 129 & n.17 (1974) (collecting cases) ("The federal
judiciary has recognized several exceptions to the general principle that each party should bear
the costs of its own legal representation. We have long recognized that attorneys' fees may be
awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or
for oppressive reasons.").

[125] <u>Chambers</u>, 501 U.S. at 46 (internal citations and quotations omitted).

[126] <u>Mead Corp., Mead Packaging Div. v. Int'l Printing & Graphic Commc'ns Union, Bristol Local</u>
<u>497, AFL-CIO</u>, 572 F. Supp. 786, 795 (E.D. Pa. 1983) (quoting <u>Mobil Oil Corporation v.</u>
<u>Independent Oil Workers Union</u>, 679 F.2d 299, 305 (3d Cir.1982)). <u>See also</u>, <u>Kane Gas Light</u>

Moreover, in <u>Mobil Oil Corp. v. Independent Oil Workers Union</u>, the Third Circuit went on to elaborate as to the type of conduct that constitutes litigation "in bad faith, vexatiously, or for oppressive reasons" in the LMRA § 301 context. According to the Third Circuit, conduct that warrants an award of fees in such an LMRA case includes: "[whether the party's] position is so lacking in merit that costs and attorney's fees should be (imposed) against it"; "[whether the party] demonstrate[ed] its good faith belief in the strength of the arguments it advanced"; "[whether the party] has a history of refusing to comply with arbitration awards [or court orders]"; and "[whether the party] presented a substantial legal issue."[127] An award's validity is further supported if the movant is, as Federal Rule of Civil Procedure 54 anticipates, the "prevailing party."[128]

There are several independent reasons why Plaintiff here ought to reimburse the Union Defendant for its fees and costs expended responding to the entirety of this litigation, including the instant Rule 54 Motion. First and most apparently, Plaintiff's conduct here was necessarily vexatious and in bad faith, as detailed in full throughout this Memorandum. Among other things, the litigation brought

---

and Heating Co. v. International Brotherhood of Firemen and Oilers, Local 112, 687 F.2d 673, 682–683 (3d Cir.1982).

[127] <u>Mobil Oil Corp. v. Indep. Oil Workers Union</u>, 679 F.2d 299, 305 (3d Cir. 1982).

[128] <u>See, e.g,</u> <u>Truesdell v. Philadelphia Hous. Auth.</u>, 290 F.3d 159, 163 (3d Cir. 2002) ("The Supreme Court has given a 'generous formulation' to the term 'prevailing party.'"). <u>See also</u> <u>Tyler v. O'Neill</u>, 112 Fed.Appx. 158, 161 (3d Cir.2004) ("Where a defendant successfully defends against a plaintiff's substantial claims and judgment is entered accordingly, the defendant is generally considered the prevailing party.").

Plaintiff was unequivocally lacking in merit in a way that effectively warrants imposition of fees incurred in the Union's defense of the allegations. Such was the case because Plaintiff's claim was both substantively frivolous as it related to his failure to show any breach of the Union's duty of good faith representation and wholly contrary to Third Circuit case law as it related to mandated procedural exhaustion in LMRA § 301 actions.[129]

Moreover, the factual baselessness and inapplicability of the legal arguments advanced by Plaintiff simply do not support a reasonably held, good faith belief in the legitimacy of Plaintiff's arguments. Further, Mr. Russo's history of filing questionable employment discrimination suits also bears upon the necessity of a fee award. In addition, the issues presented by Plaintiff both on the underlying claims as well as on the Rule 54 Motion were, at their core, insubstantial. Careful research and investigation would reasonably reveal their artificial nature. Last, the Union here was a "prevailing party" in every sense of the term—its counsel has guided it to a complete victory on summary judgment and on the instant Motion for Fees in what was otherwise an exceedingly vexatious litigation.

Further and very apparently after this Court's lengthy review and disposition of PPL's Rule 11 Motion, it simply would be inequitable to grant one Defendant

---

[129] Even given that certain indicia of "rays of hope" may have exist as it relates to a portion of Plaintiff's claim, that finding was necessitated solely due to Plaintiff's own refusal to clarify his case theory and was nevertheless inconsequential to the Court's summary judgment decision.

here relief but deny it from the other. To the contrary the very nature of Plaintiff's decision to plead a hybrid LMRA § 301 claim put both Defendants in a very similar position, defending against very similar allegations. As such a hybrid labor law claim tends to do, the hybrid claim here created strange bedfellows, to say the least. Its more significant effect, however, was to position both Defendants in a nearly identical posture, ensuring that their interests in this litigation were largely inseparable and wholly at odds to those of Mr. Russo's client. Because Rule 11 Sanctions in the form of reasonable attorney's fees have already been lodged against Plaintiff's counsel, the unique posture of this case warrants reciprocal treatment when disposing of the Union's Rule 54 Motion. Thus, because Plaintiff engaged in bad faith, vexatious conduct in this litigation and because the burden of that conduct was necessarily borne by both Defendants as a consequence of Plaintiff's filing a hybrid LMRA § 301 claim, the Union's Rule 54 Motion for Fees and Costs will also be granted in full.

## IV.   CONCLUSION

Perhaps Rule 11 inquiries such as this one were most aptly summarized by the Honorable William W. Schwarzer of the United States District Court for the Northern District of California, when he wrote:

> Of all the duties of the judge, imposing sanctions on lawyers is perhaps the most unpleasant. A desire to avoid doing so is understandable. But if judges turn from Rule 11 and let it fall into disuse, the message to those inclined to abuse or misuse the litigation

process will be clear. Misconduct, once tolerated, will breed more misconduct and those who might seek relief against abuse will instead resort to it in self-defense.[130]

Judge Schwarzer's words ring especially true to this Court as it disposes of the present matter. It would have been a far easier decision for the Court to the close this case upon handing down its Summary Judgment Memorandum and move to one of the many other cases on its docket. At the same time, the conduct of Mr. Russo here and in recent related proceedings has risen to such a troubling level that this Court would be failing its duty to the public by not somehow addressing and attempting to adequately deter it.

From Mr. Russo's perspective, however, his conduct should somehow continually be absolved because he is a sole practitioner, while PPL and the Union have virtually unlimited resources. Not so in this Court. When a federal judge takes his oath and assumes his office, he affirms to "do equal right to the poor and to the rich"—a recognition that in federal court, contrary to what some practitioners might believe, large defendants have rights too.[131] Their resources should not make them a de facto target for baseless suits aiming to extort an unwarranted settlement and transfer wealth.

As the Court instructed Mr. Russo during oral argument, now is a good time for him to retire back to his office, review any pending federal lawsuits, and put

---

[130] Sanctions Under the New Federal Rule 11—A Closer Look, 104 F.R.D. 181, 205 (1985).
[131] 28 U.S.C. § 453.

some serious thought into whether this is the kind of lawyer he wants to be.

An appropriate Order follows.


BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge