**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ERNEST KEISTER,    :  No. 4:13-cv-00118
           :
   Plaintiff,    :
           :  (Judge Brann)
   v.       :
           :
PPL CORPORATION AND  :
INTERNATIONAL BROTHERHOOD :
OF ELECTRICAL WORKERS,  :
LOCAL 1600,     :
           :
   Defendants.   :

**MEMORANDUM**

February 19, 2016

Since the baseless nature of this action was revealed, the Court has spent

upwards of one hundred and forty pages on its complete disposition—a troubling

expenditure of judicial resources for a claim based in make-believe. By

Memorandum dated December 29, 2015, the Court granted Defendant PPL

Corporation's Rule 11 Sanctions Motion and Defendant International Brotherhood

of Electrical Workers, Local 1600's Rule 54 Motion for Fees. As I noted then, both

motions "spring from the filing of a baseless employment discrimination suit" by

Ernest Keister, through his attorney Donald P. Russo, Esquire, a lawyer who had

already been sanctioned under Rule 11 in the form of public reprimand by the

Honorable Robert D. Mariani of this Court by the time I found Mr. Russo to have

1

committed a second Rule 11 violation.[1]

I therefore concluded that an award of reasonable attorney's fees was the least severe sanction required to deter Mr. Russo's improper conduct. As such, after the Court's December 29, 2015 Memorandum, all that remained to be done before bringing this now-prolonged litigation to a close was determination of the amount of fees that Mr. Russo must pay his adversaries in light of the meritless nature of the claims he had maintained. In accordance with the analysis set forth herein, the minimum reasonable amount needed to deter Mr. Russo from engaging in subsequent frivolous suits, as well as the minimum reasonable award directly attributable to Mr. Russo's vexatious conduct, is a fee award of $57,958.59 for Defendant PPL and $57,958.96 for Defendant Local 1600.

## I.    BACKGROUND

The serpentine story of this litigation is well documented in the Court's prior Memorandum of December 29, 2015 and in its Summary Judgment Memorandum dated October 6, 2015.[2] Nevertheless, for the sake of completeness, I will briefly review the unfortunate facts that have led us to this point in the litigation.

Plaintiff brought this employment discrimination lawsuit against both Defendants on January 17, 2013. The lawsuit was filed one year and seven months after Plaintiff initiated his EEOC charge, ten months after Plaintiff's last

---

[1] See ECF No. 62 at 4–5.
[2] ECF Nos. 54, 62.

meaningful communication with the Union and four months after the EEOC dismissed Plaintiff's charge and issued his right-to-sue letter.[3] Not only did the lawsuit suffer from blatant timeliness defects, but it also failed to demonstrate that either Defendant harbored any discriminatory animus toward Plaintiff whatsoever.[4]

Plaintiff's lawsuit, the entirety of which was disposed of by this Court's October 6, 2015 Memorandum granting in full both Defendants' Motions for Summary Judgment, alleged two claims of age discrimination against PPL—one under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. ("ADEA") and a second under the Pennsylvania Human Relations Act, 43 P.S. §§ 951 et seq. ("PHRA")—as well as a third claim involving a supposed hybrid violation of § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) ("LMRA") brought against both PPL and the Union.[5]

As the evidence unwound itself during discovery and depositions, it became clear that Plaintiff lacked any evidence of the wrongs he pleaded. Quite frankly, as I explained in my December 29, 2015 Memorandum, certain of Plaintiff's key factual allegations, which helped his claim survive much longer than it should otherwise have, were "unrepresentative of the truth and often [ ] wholly at odds

---

[3] See ECF No. 54 at 5, 38–40.
[4] See id. at 42.
[5] See ECF No. 54.

with Plaintiff's own deposition testimony."[6] Moreover, these blatant factual

inconsistencies needed to be considered in combination with Plaintiff's own failure

to exhaust any administrative remedies.

The core problem with this litigation was, as I have previously emphasized,

Mr. Russo's less-than-forthright averments, through which the action "was

needlessly kept alive at several junctures that should have resulted in its outright

termination."[7] Specifically, I termed Mr. Russo's conduct as constituting "specious

filings" with the intent "to coerce the Defendants into settling a meritless claim."[8]

As a consequence, "[a]bsent Mr. Russo's attempts to manufacture facts, warp the

law, and utterly cloud the action's underlying allegations," I was convinced that

"this case would have [and should have] disappeared long ago, saving Defendants,

the Court, and the public significant time and money."[9]

From the outset, I found that by considering the background of this case as

well as the background of similarly baseless cases filed by Mr. Russo in federal

court, "an award of reasonable attorney's fees [was] the least severe sanction

necessary to deter Mr. Russo's tendency to file frivolous actions."[10] Accordingly, I

granted both Defendants' Motions in full and directed the Defendants to submit a

---

[6] ECF No. 62 at 3.
[7] Id. at 4.
[8] Id.
[9] Id.
[10] Id. at 5.

comprehensive accounting of their expenses and fees, along with affidavits and

other supporting material, so that I could review their fee bills for entries that were

duplicative, unsupported, or otherwise not appropriately chargeable to Mr. Russo.[11]

One significant factor among others in the Court's decision to impose

reasonable attorney's fees for the instant violation was Mr. Russo's persistent

history of infringement in federal court. As I summarized in the December 29,

2015 Memorandum:

> Like so many times in the past, Mr. Russo unfortunately chose not to
> take the straightforward path. In fact, Mr. Russo is quite familiar with
> Rule 11 Sanctions and related ethical scrutiny. The Honorable
> Lawrence F. Stengel of the United States District Court for the
> Eastern District of Pennsylvania has previously termed Mr. Russo's
> employment discrimination work "dubious," "ill-conceived," "poorly
> presented," "silly," and "riddled with credibility shortcomings." In
> addition, as noted above, just one week before he filed his briefs in
> opposition to Defendants' Summary Judgment Motions in this case,
> Mr. Russo was publicly sanctioned under Rule 11 by the Honorable
> Robert D. Mariani of this Court for maintaining a similar employment
> discrimination claim that Judge Mariani deemed "patently
> unmeritorious" and "frivolous." Judge Mariani would go on to
> criticize Mr. Russo's "litigation history" as "troubling." Mr. Russo
> also recently received a second public reprimand, this time from the
> Supreme Court of Pennsylvania's Disciplinary Board. Suffice it to
> say, Mr. Russo is simply not getting the message.[12]

Having disposed completely of Defendants' Motions for Summary

Judgment as well as having determined that an award of reasonable attorney's fees

is the least severe sanction necessary to deter Mr. Russo, I must now assess the

---

[11]  ECF No. 63.
[12]  ECF No. 62 at 5 (internal citations omitted).

appropriate amount of the fee award, taking all relevant mitigating and aggravating factors into account.

## II.   LAW

The only remaining issue is the amount of reasonable attorney's fees necessary to adequately deter Mr. Russo from filing similarly frivolous actions and reasonably attributable to Mr. Russo's vexatious conduct in the instant case. "[T]he so-called 'American Rule' prohibits fee shifting in most cases."[13] The Supreme Court of the United States has, however, carved three primary exceptions to the American Rule. The applicable exception here is that "a court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[14] The Supreme Court described the contours of this exception in <u>Chambers</u>, explaining:

> In this regard, if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order. The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicating judicial

---

[13] <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 45 (1991) (quoting <u>Alyeska</u>, 421 U.S. at 259).

[14] <u>Chambers</u>, 501 U.S. at 45 (quoting <u>Alyeska</u>, 421 U.S. at 259). <u>See also</u> <u>F. D. Rich Co. v. U. S. for Use of Indus. Lumber Co.</u>, 417 U.S. 116, 129 & n.17 (1974) (collecting cases) ("The federal judiciary has recognized several exceptions to the general principle that each party should bear the costs of its own legal representation. We have long recognized that attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.").

authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy.[15]

The United States Court of Appeals for the Third Circuit has applied this exception to hybrid claims brought pursuant to § 301 of the LMRA. Specifically, in the context of litigation brought to vacate arbitration awards under § 301, the Third Circuit has stated, "Under the American rule, each party normally must bear the burden of its own legal expenses, including attorneys' fees. One of the narrow exceptions to this rule is a finding that the losing party litigated in bad faith, vexatiously, or for oppressive reasons."[16]

Moreover, in Mobil Oil Corp. v. Independent Oil Workers Union, the Third Circuit went on to elaborate as to the type of conduct that constitutes litigation "in bad faith, vexatiously, or for oppressive reasons" in the LMRA § 301 context. According to the Third Circuit, conduct that warrants an award of fees in such an LMRA case includes: "[whether the party's] position is so lacking in merit that costs and attorney's fees should be (imposed) against it"; "[whether the party] demonstrate[ed] its good faith belief in the strength of the arguments it advanced"; "[whether the party] has a history of refusing to comply with arbitration awards [or

---

[15] Chambers, 501 U.S. at 46 (internal citations and quotations omitted).

[16] Mead Corp., Mead Packaging Div. v. Int'l Printing & Graphic Commc'ns Union, Bristol Local 497, AFL-CIO, 572 F. Supp. 786, 795 (E.D. Pa. 1983) (quoting Mobil Oil Corporation v. Independent Oil Workers Union, 679 F.2d 299, 305 (3d Cir.1982)). See also, Kane Gas Light and Heating Co. v. International Brotherhood of Firemen and Oilers, Local 112, 687 F.2d 673, 682–683 (3d Cir.1982).

court orders]"; and "[whether the party] presented a substantial legal issue."[17] An award's validity is further supported if the movant is, as Federal Rule of Civil Procedure 54 anticipates, the "prevailing party."[18]

Once it is established that the party prevailed, the court must determine reasonable fees under the lodestar formula: the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."[19] "The party seeking attorney's fees has the burden to prove that its request for attorney's fees is reasonable."[20] "To meet its burden, the fee petitioner must 'submit evidence supporting the hours worked and rates claimed.'"[21] "The amount of the fee, of course, must be determined on the facts of each case."[22] Once the fee petitioner meets this <u>prima</u> <u>facie</u> burden, "the party opposing the fee award then has the burden to challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee."[23]

"The most useful starting point for determining the amount of a reasonable

---

[17] <u>Mobil Oil Corp. v. Indep. Oil Workers Union</u>, 679 F.2d 299, 305 (3d Cir. 1982).

[18] <u>See, e.g.</u>, <u>Truesdell v. Philadelphia Hous. Auth.</u>, 290 F.3d 159, 163 (3d Cir. 2002) ("The Supreme Court has given a 'generous formulation' to the term 'prevailing party.'"). <u>See also</u> <u>Tyler v. O'Neill</u>, 112 Fed.Appx. 158, 161 (3d Cir.2004) ("Where a defendant successfully defends against a plaintiff's substantial claims and judgment is entered accordingly, the defendant is generally considered the prevailing party.").

[19] <u>Hensley</u>, 461 U.S. at 433; <u>Pennsylvania v. Delaware Valley Citizens' Council for Clean Air</u>, 478 U.S. 546, 554 (1986); <u>Maldonado v. Houstoun</u>, 256 F.3d 181, 184 (3d Cir.2001).

[20] <u>Rode v. Dellarciprete</u>, 892 F.2d 1177, 1183 (3d Cir.1990) (Nygaard, J.).

[21] <u>Id.</u> (quoting <u>Hensley</u>, 461 U.S. at 433).

[22] <u>Hensley</u>, 461 U.S. at 429–30.

[23] <u>Rode</u>, 892 F.2d at 1183.

fee is the number of hours reasonably expended on the litigation."[24] "The district court should exclude hours that are not reasonably expended."[25] "Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary."[26]

"After determining the number of hours reasonably expended, the district court must examine whether the requested hourly rate is reasonable."[27] "Generally, a reasonable hourly rate is to be calculated according to the prevailing market rates in the relevant community."[28] This "forum rate rule" dictates that, generally "an 'out-of-town lawyer would receive not the hourly rate prescribed by his district but rather the hourly rate prevailing in the forum in which the litigation is lodged.'"[29]

In setting a reasonable fee, the district court "necessarily has discretion in making this equitable judgment."[30] "This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters."[31] As such, "[a] request for attorney's fees should not result in a second major litigation."[32] "There

---

[24] Hensley, 461 U.S. at 433.
[25] Rode, 892 F.2d at 1183.
[26] Id.
[27] Id.
[28] Id. (citing Blum v. Stenson, 465 U.S. 886, 895 (1984)).
[29] Interfaith Cmty. Org. v. Honeywell Intern., Inc., 426 F.3d 694, 704 (3d Cir.2005) (Becker, J.) (quoting Report of the Third Circuit Task Force on Court Awarded Attorney Fees, 108 F.R.D. 237, 261 (1986)).
[30] Id. at 437.
[31] Id.
[32] Id.

is no precise rule or formula for making these determinations."[33] The district court

need only "provide a concise but clear explanation of its reasons for the fee award"

and "make clear that it has considered the relationship between the amount of the

fee awarded and the results obtained."[34]

## III. ANALYSIS

### A. Defendant PPL's Lodestar Fee and Cost Award is $64,007.09.

Defendant PPL has submitted the affidavit of lead counsel Steven E.

Hoffman, Esquire, in addition to a detailed, supporting fee bill.[35] Mr. Hoffman's

affidavit sets forth the educational and practice background, the charged hourly

rate, and the hours expended by each of the four members of his legal staff on the

Keister matter. At all times during the litigation, Mr. Hoffman was a partner at

Norris, McLaughlin & Marcus, P.A.[36] Mr. Hoffman has practiced law since 1991,

after his graduation from Widener University School of Law that year.[37]

Mr. Hoffman was assisted in the matter by his colleagues Edward J.

Easterly, Esquire, and John J. Buckley, III, Esquire, both of Norris, McLaughlin.[38]

Mr. Easterly began practicing law after his graduation from Villanova University

---

[33] Id. at 436.
[34] Id. at 437.
[35] ECF No. 64. ECF No. 64 Ex. 1.
[36] ECF No. 64 at 1.
[37] Id. at 2.
[38] Id.

School of Law in 2006.[39] Mr. Easterly was elevated from associate to partner in

January 2015, during the course of this litigation.[40] Mr. Buckley commenced

employment with Norris, McLaughlin in March 2014, following a clerkship with

the Honorable A. Richard Caputo of this Court.[41] Attorneys Hoffman, Easterly,

and Buckley were assisted by paralegal Connie Cecala.[42] No other Norris,

McLaughlin employee charged time to the Keister matter.

According to Mr. Hoffman's affidavit, Norris, McLaughlin bills partner time

at $275.00 per hour, associate time at $175.00 per hour, and paralegal time at

$125.00 per hour. In Beattie v. Line Mountain School District, I reset the standard

forum rates for attorneys in the Williamsport vicinage of this Court to range from

$150 to $325 per hour, depending on the attorney's experience, the complexity of

the litigation, and the quality of the submitted work product.[43] Unsurprisingly and

in accordance with the quality of his research and submissions throughout this

litigation, Mr. Hoffman has cited to Beattie in his fee affidavit.[44]

The Court finds that, based upon their experience, the extent of the

discovery required, the quality of their submissions, and their alignment with

---

[39] Id. at 3.
[40] Id. at 6. Mr. Easterly's time was billed at the associate rate prior to January 2015 and at the partner rate thereafter.
[41] Id. at 5.
[42] Id. at 2.
[43] No. 4:13-CV-02655, 2014 WL 3400975, at *10 (M.D. Pa. July 10, 2014).
[44] ECF No. 64 at 6.

previously approved forum rates, the hourly rates charged by each of the three

Norris, McLaughlin attorneys on behalf of PPL were consistent, reasonable, and

necessary in putting forth a vigorous defense in this action. In calculating the

lodestar amount, the Court will reduce Ms. Cecala's hourly rate from $125.00 to

$90.00, consistent with precedent for paralegal rates in this venire of the Court.[45]

Table 1 below depicts PPL's lodestar fee and cost award calculation. The

initial lodestar total is $64,007.09. Line-by-line reductions are calculated below in

Section III.

| Table 1. PPL's Lodestar Fee and Cost Award Calculation | | | |
|---|---|---|---|
| **Timekeeper** | **Rate** | **Hours** | **Total** |
| Steven E. Hoffman, Esq. | $275.00 | 94.10 | $25,877.50 |
| Edward J. Easterly, Esq. (Partner Rate) | $275.00 | 107.60 | $29,590.00 |
| Edward J. Easterly, Esq. (Associate Rate) | $175.00 | 29.00 | $5,075.00 |
| John J. Buckley, III, Esq. | $175.00 | 8.60 | $1,505.00 |
| Connie Cecala | $90.00 | 6.00 | $540.00 |
| Costs | | | $1,419.59 |
| | | **Total** | **$64,007.09** |

**B.      Defendant Local 1600's Lodestar Fee and Cost Award is $61,896.46.**

Defendant Local 1600 has also submitted the affidavit of counsel Quintes D.

---

[45]  See, e.g., Joe Hand Promotions, Inc. v. Tickle, No. 4:12-CV-01874, 2016 WL 393797, at *12 n.89 (M.D. Pa. Feb. 2, 2016).

Taglioli, Esquire, in addition to a detailed, supporting fee bill.[46] Mr. Taglioli's affidavit sets forth the educational and practice background, the charged hourly rate, and the hours expended on the Keister matter. At all times during the litigation, Mr. Taglioli was a partner at Markowitz & Richman.[47] Mr. Taglioli has been practicing law since his graduation from Vanderbilt University School of Law in 1979.[48] All hours billed in this matter by Markowitz & Richman were billed to the Union by Mr. Taglioli, except for attendance at a March 25, 2015 deposition by Daniel E. Taglioli, Esquire, of the same firm.[49]

The primary issue the Court has confronted in reviewing Mr. Taglioli's fee bill is that the hourly rate he charged to the Local 1600 lands well to the low end of the reasonable fee range set by Beattie and typically charged to private employers in labor disputes by lawyers of Mr. Taglioli's skill and experience. As Mr. Taglioli's affidavit indicates, "lawyers who represent labor unions in labor and employment matters bill at rates substantially less than hourly rates of lawyers representing employers."[50] Mr. Taglioli submits the affidavits of two attorneys with extensive experience in labor law disputes: Richard M. Goldberg, Esquire, of

---

[46] ECF No. 66.
[47] Id. at 1.
[48] Id. at 2.
[49] Id. at 9. Because the 5.0 hours billed on March 25, 2015 entry is not divided in any way between the two attorneys, the Court conservatively assumes that all 5.0 hours of deposition preparation and attendance were billed by Daniel Taglioli at $185.00 per hour.
[50] Id. at 3.

13

Hourigan, Kluger & Quinn, PC, located in Wilkes-Barre, Pennsylvania, as well as

Ira H. Weinstock, Esquire, of Ira H. Weinstock, PC, located in Harrisburg,

Pennsylvania.[51] Both affiants confirm that it is customary for attorneys who

provide legal representation to labor unions to charge a rate well below that

charged to private employers.[52] Both affiants also confirm the reasonableness of a

market rate in the range of $250.00 to $750.00 per hour, based upon the work Mr.

Taglioli performed in the present matter.[53] As such, and given the hourly rate

charged by Mr. Hoffman to PPL in this matter, Mr. Taglioli suggests that the Court

should align his hourly fee with the prevailing market rate. Mr. Russo does not

object to this request.

In the context of statutory fee awards for parties who prevail in cases that

touch upon matters in the public interest, the Supreme Court of the United States

has supported a district court's ability to vary an award of attorney's fees upward

or downward based upon the following twelve factors:

(1)    the time and labor required;
(2)    the novelty and difficulty of the questions;
(3)    the skill requisite to perform the legal service properly;
(4)    the preclusion of employment by the attorney due to acceptance
       of the case;
(5)    the customary fee;
(6)    whether the fee is fixed or contingent;
(7)    time limitations imposed by the client or the circumstances;

---

[51] Id. at 15, 22.
[52] Id. at 17, 24.
[53] Id.

14

(8)    the amount involved and the results obtained;

(9)    the experience, reputation, and ability of the attorneys;

(10)   the "undesirability" of the case;

(11)   the nature and length of the professional relationship with the client;

(12)   awards in similar cases.[54]

Furthermore, when it interpreted the term "reasonable fees" in a similar context, the Supreme Court confirmed that fee awards "are to be calculated according to the prevailing market rates in the relevant community."[55] District Courts are to apply the community-based approach "regardless of whether [the party] is represented by private or nonprofit counsel."[56] The Supreme Court has mandated such consistency when it comes to an award of fees precisely because fee awards such cases should "be governed by the same standards which prevail in other types of equally complex Federal litigation."[57]Specifically, a district court "must avoid . . . decreasing reasonable fees because the attorneys conducted the litigation more as an act of <u>pro bono publico</u> than as an effort at securing a large monetary return."[58]

To that extent, the Supreme Court has crafted a definition of the term "reasonable attorney's fee" that transcends various species of litigation, simply by

---

[54] <u>Hensley,</u> 461 U.S. at 430 ("The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward.") (citing <u>Johnson v. Georgia Highway Express, Inc.,</u> 488 F.2d 714 (5th Cir. 1974)).

[55] <u>Blum v. Stenson,</u> 465 U.S. 886, 895 (1984).

[56] <u>Id.</u>

[57] <u>Id.</u> at 893.

[58] <u>Id.</u> at 894 (quoting <u>Stanford Daily v. Zurcher,</u> 64 F.R.D. 680, 681 (N.D. Cal. 1974)).

requiring a presiding judge to "contemplate[ ] reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff, no more and no less."[59] Such is the case irrespective of a fee agreement that would limit recovery or a decision by counsel to take on a case at a reduced rate or for no compensation at all, as it would introduce unjustified inconsistencies should these considerations "bar the award of a reasonable fee" in some cases but not in others.[60] To that point, should courts take an overly restrictive approach to supplementation of a fee award, it takes minimal foresight to anticipate the resulting deterrent effect on the supply of willing attorneys to accept such cases at lower than prevailing market rates. The Supreme Court has correspondingly explained that consistent awards of reasonable fees prevent the "balance struck" between fair reimbursement and improper windfalls from "go[ing] awry."[61]

Thus, as applied to the instant case, in Student Public Interest Research Group ("SPIRG") of New Jersey, Inc. v. AT&T Bell Laboratories, the Honorable Edward R. Becker, writing for the Third Circuit, determined that when private, for-profit law firms accept cases that touch upon matters in the public interest, "the community billing rate charged by attorneys of equivalent skill and experience

---

[59] Blanchard v. Bergeron, 489 U.S. 87, 93 (1989).
[60] Id. at 94.
[61] Hensley, 461 U.S. at 447 (Brennan, J., concurring in part and dissenting in part).

16

performing work of similar complexity, rather than the firm's billing rate, is the appropriate hourly rate for computing the lodestar."[62] In that same case, the Third Circuit rejected the so-called "billing rate rule," which would have bounded awards of attorney's fees to the terms set forth in initial attorney-client agreements. Such an approach, the Third Circuit reasoned, was "too rigid and at odds with the Supreme Court's holding in Blum," a holding that "mandate[d]" reliance on competitive market rates in the pertinent community.[63]

The crux of the issue as it pertains to Mr. Taglioli's unopposed request for subsidization of his fee to align it with that of a prevailing, competitive rate—is whether legal services performed for labor unions at a below-market price properly come within the reach of the above-quoted Supreme Court and Third Circuit decisions authorizing such supplementation. Based on my review of the law and, equally important, the economics of such fee arrangements, I am of the view that supplementation of Mr. Taglioli's lodestar hourly rate is entirely appropriate here.

At a very surface level, whether representation of a labor union by a private firm serves the public interest by enabling organized labor is a question whose answer could easily vary based upon the identity of the respondent and his or her own political predilections. The law as developed by the Supreme Court and the Third Circuit demands a more steadfast approach, however. Indeed, upon closer

---

[62] 842 F.2d 1436, 1450 (3d Cir. 1988).
[63] Id. at 1448, 1450.

review of the law, whether a given attorney's fee qualify for supplementation based on the Blum and SPIRG line of cases necessarily hinges on whether market forces in the particular practice area exert undue downward pressure on what would otherwise be a competitive price for legal services. Thus, while the initial development of the doctrine permitting fee supplementation had its roots in cases involving traditional public interest arrangements and pro bono publico representation, several federal courts have extended the reasoning in Blum, SPIRG, and their progeny to attorneys who represent labor unions.[64]

Because the case law outlining the calculation of attorney's fees in the Third Circuit demands consideration of reasonable hourly rates—rates that prevail in a competitive market for legal services in a given community—it is of little surprise that subsidization of a fee award for attorneys who represent unions is warranted. The simple reasoning is that the economics of union representation prevents a union lawyer from achieving the competitive rate that prevails in the marketplace.

---

[64] See, e.g., Marinelli v. City of Erie, 25 F. Supp. 2d 674, 682 (W.D. Pa. 1998) ("We do not read the controlling authority in this circuit to state that the community market value rule for determining counsel fees under a fee-shifting statute such as the ADA applies only where the plaintiff is represented by a public interest or non-profit firm."), rev'd on other grounds, 216 F.3d 354 (3d Cir. 2000); M.R.S. Enterprises, Inc. v. Sheet Metal Workers' Int'l Ass'n, No. CIV.A.05 1823 CKK/JM, 2007 WL 950071, at *3 (D.D.C. Mar. 29, 2007) ("[W]hen counsel offer a certain class of clients a discounted rate in the public interest, they are entitled to the market rate, not the discounted rate."); Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516, 1524 (D.C. Cir. 1988) ("Henceforth, the prevailing market rate method heretofore used in awarding fees to traditional for-profit firms and public interest legal services organizations shall apply as well to those attorneys who practice privately and for profit but at reduced rates reflecting non-economic goals.").

As the Honorable Richard A. Posner of the United States Court of Appeals for the Seventh Circuit has observed, a union "solves the free-rider problems that workers would encounter if they tried to organize . . . themselves."[65] Effectively then, when purchasing legal services, the union members "band[ ] together into a buyers' cartel," a market device that forces attorney's fees below the competitive market rate by aggregating all potential sources of individual demand into a "sole buyer" that is the union.[66]

Accordingly, I deem it appropriate to adjust Mr. Taglioli's hourly rate upward. Not only does such an upward adjustment correct for market distortions that have resulted in artificially low hourly rates, but just as critically, it recognizes Mr. Taglioli's superior work product. In addition to the results obtained by Mr. Taglioli for his client, such a supplementation of his fee award confirms that his performance in this litigation was fully worthy of the market-paying rate in labor and employment disputes occurring in the Williamsport vicinage of this Court. Accordingly, Mr. Taglioli's hourly rate should be adjusted upward to $275.00 per hour in order to align with the market rate received by Mr. Hoffman in this litigation and in accordance with all of the factors discussed above.

Table 2 below depicts the Union's lodestar fee and cost award calculation. The initial lodestar total is $61,896.46. Line-by-line reductions are calculated

---

[65] Richard A. Posner, Economic Analysis of Law § 11.2 at 429 (8th ed. 2010).
[66] Id. at 431.

below in Section III.

| Table 2. Local 1600's Lodestar Fee and Cost Award Calculation | | | |
|---|---|---|---|
| **Timekeeper** | **Rate** | **Hours** | **Total** |
| Quintes D. Taglioli, Esq. | $275.00 | 215.10 | $59,152.50 |
| Daniel E. Taglioli, Esq. | $185.00 | 5.00 | $925.00 |
| Costs | | | $1,818.96 |
| | | **Total** | **$61,896.46** |

### C. The Court Has Reviewed Mr. Russo's Objections, Has Conducted A Line-by-line Review Of Defendants' Fee Bills, Has Applied The Mitigating Factors Set Forth In <u>Doering,</u> And Now Adjusts The Fee Awards Downward Based Upon Equitable Considerations.

"The court may not reduce an award <u>sua sponte</u>; rather, it can only do so in response to <u>specific</u> objections made by the opposing party."[67] Thus, in its Order setting the briefing schedule for the fee award portion of this litigation, the Court first set a deadline for Defendants to submit their fee bills and supporting affidavits.[68] It then set a subsequent deadline for Mr. Russo to submit any "responsive papers for the sole purpose of contesting Defendants' fee bill submissions and supporting papers."[69] Defendants were then afforded an opportunity to reply to Mr. Russo's objections.[70] This supplementary briefing schedule was set after this Court conducted a full Rule 11 and Rule 54 hearing at

---

[67] <u>Interfaith Cmty. Org. v. Honeywell Int'l, Inc.</u>, 426 F.3d 694, 711 (3d Cir. 2005) (Becker, J.) (second emphasis added).

[68] ECF No. 63 at 2.

[69] <u>Id.</u> at 2.

[70] <u>Id.</u> at 2–3.

which time both parties submitted documentary evidence, supporting authorities, and oral argument to the court. I have considered all of these submissions in conjunction with the underlying factual record in coming to a judgment as to the appropriate amount of a fee award here.

### 1. Mr. Russo's Objections That PPL Employed "Excessive" Resources And Failed To Mitigate Its Expenses Are Wholly Without Merit, Given The Unique Posture Of This Litigation.

Mr. Russo submits four objections, though the four objections are ill-defined, and the bounds of one necessarily bleed into the others. His primary contention in his first objection is that PPL's fee request is excessive because PPL was "under a duty to 'measure its opposition' and not expend so much time and money as to 'overwhelm the relatively weak resources of the opposition.'"[71] Accordingly, Mr. Russo argues that PPL's use of three attorneys and one paralegal was excessive compared to the resources he was able to expend as a sole practitioner.[72]

Mr. Russo cites to In re Smith, a bankruptcy decision refusing to grant a Rule 11 motion brought by the Internal Revenue Service (IRS) because the IRS "was clearly 'guilty of overkill.'"[73] The bankruptcy court in Smith, however, "fail[ed] to find that [the opposing party's] conduct was substantively 'patently

---

[71] ECF No. 67 at 2.
[72] Id.
[73] 111 B.R. 81, 87 (Bankr. E.D. Pa. 1990).

frivolous' or that it manifested any improper purpose."[74] The facts of <u>Smith</u> are a far cry from the events that transpired here. In the first instance, Mr. Russo's conduct was "patently frivolous," because, among other reasons, he lodged averments about evidence that turned out not to exist and that were wholly contradicted by his client's own testimony. In a calculating fashion, Mr. Russo would loft these unsubstantiated averments at precisely the most problematic junctures, making dismissal of his client's then Second Amended Complaint infeasible. Lawyering, it turns out, is much easier when an advocate believes he can manufacture plausibility or conjure up genuine disputes of material fact out of thin air. To the contrary, this Court recognizes such behavior cheats the system.

In the second instance, the reality of this case is that although it eventually was disposed of on summary judgment after discovery revealed the claim's total lack of merit, Mr. Russo's pleadings cast the matter as an action supported by a discriminatory intent that simply never materialized. As such, PPL was not guilty of litigious excess. Quite the opposite, as a result of Mr. Russo's sweeping averments of age-based discriminatory animus, of a record of younger comparators who received more favorable treatment than his client, and of a willful breach of the collective bargaining agreement, PPL's attorneys necessarily had to mount a vigorous defense, engage in discovery, and contest all of Plaintiff's motions. One

---

[74] <u>Id.</u> at 86.

might say that to the extent that Mr. Russo believes PPL's response was in any way excessive, that delusion is wholly self-induced.

Regardless, the basic factual claim that staffing three attorneys and a paralegal on the defense team here constituted excess is unsupported. There is a simple but obvious difference between a firm's larding on artificial billable hours and its expending legitimate time defending against an action. As the finder of fact and the tribunal most familiar with the posture of this action and the attorneys' presentations, I would reaffirm as I did in my December 29, 2015 Memorandum, that counsel for Defendants here submitted written work, offered oral presentations, and maintained appropriate decorum with the Court in a way that placed them in the top echelon of advocates who appear before me. Moreover, counsel for PPL points out, and the supporting records accurately reflect, that the majority of the work on this matter was completed by two of its firm's attorneys— one partner and one associate who was elevated to the rank of partner during the course of this litigation.

Just because PPL's approach was not excessive does not mean that the Court need not trim back any unnecessarily duplicative entries. I am, of course, still required to engage in such an inquiry. However, because of the nature of Defendant's objection, it is important to observe at the outset that nothing about the way in which PPL has staffed this case was in the least bit excessive. A

defendant is certainly entitled to raise a defense on its own behalf, and when a plaintiff alleges the types of conduct Mr. Russo and his client alleged here, assembly of a vigorous defense should not surprise an enterprising plaintiff's lawyer.

Construing Mr. Russo's objections as liberally as possible, his next point of contention is that PPL failed to "mitigate the award it seeks."[75] In support of this "mitigation" argument, Mr. Russo first highlights several billable entries that he believes are overstated. Second, Mr. Russo argues that he should not be liable for any fees incurred subsequent to PPL's filing of its Rule 11 Motion. As such, the Court will scrutinize the particular entries Mr. Russo has flagged, just as it has reviewed all entries with a careful eye toward avoidance of duplicative tasks. However, Mr. Russo's contention that he is not liable for post-motion conduct is unsupportable because the bulk of the time entered in this case by PPL necessarily was a direct consequence of Mr. Russo's Rule 11 violation.

To explain by way of contrast, Mr. Russo's objections on this front highlight Pollution Control, a case purportedly standing for the proposition that district courts will be reversed for imposition of post-motion fees.[76] Upon closer reading and not at all to this Court's surprise, PPL accurately points out in its responsive papers that the case Mr. Russo has cited does not stand for the claimed proposition

---

[75] ECF No. 67 at 2, 5.
[76] ECF No. 67 at 3.

at all. As PPL writes in reply to Mr. Russo's description of the <u>Pollution Control</u>

case, "[t]he facts of <u>Pollution Control</u>, however, do not support Attorney Russo's

contention. In <u>Pollution Control</u>, the Court did, in fact, vacate the sanctions

awarded by the District Court. The Court did so, however, because the defendant

completely ignored the issue upon which the case was actually dismissed from the

commencement of litigation through the dismissal."[77] This Court agrees that the

clear language of the <u>Pollution Control</u> decision undermine Mr. Russo's version of

the facts.

To quote the <u>Pollution Control</u> court, in that case, "defendants' conduct was

far more egregious . . . in that they failed even to respond to the diversity

problem."[78] Contrary to what transpired in this matter, in <u>Pollution Control</u>,

"[i]nstead of raising that straightforward issue, the defendants chose to proceed on

the basis of a much more complicated question—the lack of personal

jurisdiction."[79] Whereas in that case, "[t]he defendants could have avoided nearly

all of their expenses . . . by way of a more reasonable approach," PPL here was left

no choice by the sweeping allegations Mr. Russo furthered at several junctures

throughout this litigation than to prove those accusations unfounded by way of

---

[77] ECF No. 68 at 3.
[78] <u>Pollution Control Indus. of Am., Inc. v. Van Gundy</u>, 21 F.3d 152, 156 (7th Cir. 1994).
[79] <u>Id.</u>

discovery and a vigorous defense.[80] As the Court explained in its December 29,

2015 Memorandum:

> The Court finds it instructive to address the following potential counterargument: If the underlying case was so meritless, why did Defendants require such extensive time and effort to bring it to resolution? The answer is that Mr. Russo, at several junctures already enumerated, consistently disguised the fatal flaws of his client's claims by furthering unsupported factual allegations and failing to adequately address Defendants' factual contentions. This was a case built largely on Mr. Russo's posturing, the consistent filing of pleadings, which amounted to nothing more than bluffs that Defendants here were not afraid to call. That the underlying claims were meritless was known to at least one person: Mr. Russo. Yet, he chose to conceal his case's weaknesses rather than litigate in good faith. Had Defendants not been forced to deal with Mr. Russo's circuitous and less than straightforward pleadings, this litigation would have ended long ago. Because the frivolous nature of the underlying claims was concealed by Mr. Russo, Defendants are entitled to the reasonable attorney's fees in the full amount of those fees incurred defending the entire case. That is because the entire case was enabled by Mr. Russo's violations.[81]

Moreover, not only is Mr. Russo's reliance on the <u>Pollution Control</u> decision

questionable, but the harsh irony of Mr. Russo's mitigation argument is that PPL

presented him with the chance to mitigate his losses in the form of a Rule 11 Safe

Harbor Notice, a notice that Mr. Russo effectively crumpled up and tossed back

into the faces of PPL's lawyers. In fact, in response to PPL's Rule 11 Safe Harbor

Notice, Mr. Russo brazenly instructed PPL's lawyers in a rambling, single-spaced,

three-page letter that he would bring PPL's "obstreperous and intransigent

---

[80] <u>Id.</u>

[81] ECF No. 62 at 45.

behavior to the Court's attention."[82] According to Mr. Russo, who vowed to "vigorously oppose[ ]" PPL's Rule 11 Motion from that point on, it was actually PPL who had acted "in bad faith."[83] Perhaps the best response to this objection is a simple recitation of PPL's explanation in its responsive papers: Mr. Russo's mitigation argument simply "is not based on the actual events which occurred in this case."[84] "[O]bstreperous and intransigent behavior" has in fact caught this Court's attention, but lo and behold, it was not Mr. Hoffman's.

### 2.     The Court Will Reduce Both Parties' Lodestar Awards Based Upon Its Line-by-line Review of the Parties' Fee Bills.

Although Mr. Russo's objections as to excessive staffing and failure to mitigate on PPL's part are unavailing, the Court also conducted an independent, line-by-line review of PPL's and the Union's fee bills so that it might eliminate any entries that were duplicative, unsupported, or unreasonably charged. Taking into account the individual entries contested by Mr. Russo as well as the Court's independent line-by-line review, I would make the following downward revisions to PPL's and the Union's fee awards for reasons listed below:

### Reductions to PPL's Fee Award

1.     <u>July 21, 2014</u>: Reduction of time spent by JB to "Prepare Case

---

[82]  ECF No. 68 Ex. 1 at 2.
[83]  ECF No. 68 Ex. 1 at 2.
[84]  ECF No. 68 at 4.

Management Plan" from "2.50" to "2.00" hours based upon the collaborative nature of the joint case management plan, the review and revision of the plan by other lawyers, and the ultimate submission.

2.  September 11, 2014: Reduction of time spent by SEH to "Receive and review Keister emails" from "1.00" to "0.50" hours based upon the time reasonably expected to be expended, given the nature of the itemized task.

3.  October 10, 2014: Reduction of time spent by SEH to "Receive and review EEOC file" from "1.50" to "1.00" hours based upon the time reasonably expected to be expended, given the nature of the itemized task.

4.  January 6, 2015: Reduction of time spent by EJE to "Review EEOC file to prepare for deposition" from "1.90" to "1.00" hours based upon the time reasonably expected to be expended, given the nature of the itemized task, as well as the similar nature of an itemized entry by SEH on October 10, 2014.

5.  January 12, 2015: Reduction of time spent by EJE to "Review file to prepare for deposition of Plaintiff" from "5.90" to "5.00" hours, based upon the time reasonably expected to be expended, given the nature of the itemized task.

6.  February 16, 2015: Reduction of time spent by EJE to "Review file and draft responses to discovery requests" from "4.00" to "3.50" hours, based upon the time reasonably expected to be expended, given the nature of the itemized task.

7.  March 10, 2015: Reduction of time spent by EJE to "Prepare for deposition of Plaintiff" from "5.40" to "5.00" hours, based upon the time reasonably expected to be expended, given the nature of the itemized task.

8.  March 24–25, 2015: Reduction of total time spent by EJE preparing for and attending Berwick depositions from "9.90" to "8.00" hours based upon the time reasonably expected to be expended, given the nature of the itemized task.

9. <u>April 1, 2015</u>: Reduction of time spent by CC on "Deposition digest of E. Keister" from "5.90" to "4.50" hours, based upon the time reasonably expected to be expended, given the nature of the itemized task, as well as a similarly lengthy itemization by CC on March 31, 2015.

10. <u>April 7, 2015</u>: Reduction of time spent by EJE to "Draft Rule 11 Safe Harbor Notice for attorneys fees" from "5.20" to "2.50" hours, based upon the time reasonably expected to be expended, given the nature of the itemized task.

11. <u>May 4–6, 2015</u>: Reduction of total time spent by EJE Drafting Motion for Sanctions from "5.80" to "5.00" hours based upon the time reasonably expected to be expended, given the nature of the itemized task.

12. <u>June 29, 2015</u>: Reduction of time spent by EJE to "Revise Motion for Summary Judgment . . . " from "2.80" to "1.50" hours based upon the time reasonably expected to be expended, given the nature of the itemized task, as well as the similar nature of itemized entries made by SEH during June 2015.

13. <u>October 29, 2015</u>: Reduction of time spent by EJE to "Attend Rule 11 Hearing" from "9.00" to "0.00" hours based upon EJE's non-participatory capacity in the hearing.

For the sake of completeness, the Court also notes that in his objections to

PPL's fee bill, Mr. Russo takes issue with PPL's expenditure on a hotel room in

Mifflinville, Columbia County for Mr. Easterly for what was purportedly this

Court's Rule 11 hearing. As PPL notes, a review of the record indicates that this

expenditure was incurred in connection with depositions that took place at

Defendant's Berwick, Columbia County location and not the Rule 11 hearing held

in Williamsport, Lycoming County.[85] The Court therefore deems that expense

appropriate.

Moreover, in its line-by-line review of PPL's fee bill, the Court has

reviewed each of the objections Mr. Russo specifically enumerated in his

responsive papers as to particular entries of time.[86] The Court believes that other

than those reductions listed above, all other entries made by PPL's legal team were

wholly appropriate and reflective of the excellent work product the Court has

received from PPL.

### Reductions to the Union's Fee Award

1. <u>May 14, 2013</u>: Reduction of time spent on "Telephone Call . . .; Review of file; [and] Preparation of Memorandum" from "2.40" to "2.00" hours based upon the time reasonably expected to be expended, given the nature of the itemized tasks.

2. <u>June 7, 2013</u>: Reduction of time spent on "Preparation of Motion to Dismiss [and] Review of Amended Complaint and Brief filed by Opposing" from "5.70" to "5.00" hours based upon the time reasonably expected to be expended, given the nature of the itemized tasks.

3. <u>June 18–24, 2014</u>: Reduction of total time spent on "Research; Preparation of Brief in Support; [and] Finalization and Filing of Motion to Dismiss" from "29.10" to "27.00" based upon the time reasonably expected to be expended, given the nature of the itemized tasks.

4. <u>June 20, 2014</u>: Reduction of time spent on "Review of Order, Memorandum in Support of Order and Amended Complaint; [and]

---

[85] ECF No. 68 at 2.
[86] ECF No. 67 at 3.

Correspondence with Union Representative Zerbe" from "3.70" to "3.00" based upon the time reasonably expected to be expended, given the nature of the itemized tasks.

5.      June 28, 2014: Reduction of time spent on "Preparation of Answer" from "3.90" to "3.00" based upon the time reasonably expected to be expended, given the nature of the itemized tasks.

6.      July 1, 2014: Reduction of time spent on "Telephone call with Atty. Hoffman; [and] Preparation of Answer and Affirmative Defenses" from "4.30" to "3.50" based upon the time reasonably expected to be expended, given the nature of the itemized tasks.

7.      July 28, 2014: Reduction of time spent on "Email to and from Union Representative Zerbe; Email to and from Atty. Hoffman; [and] Review of Case Management Report" from "4.30" to "3.50" based upon the time reasonably expected to be expended, given the nature of the itemized tasks.

8.      March 5, 2015: Reduction of time spent on "Review of discovery requests[and] Email to and from Atty. Russo" from "4.40" to "3.75" based upon the time reasonably expected to be expended, given the nature of the itemized tasks.

9.      June 23, 2015: Reduction of total time spent on all itemized tasks for this date from "12.30" to "10.00" based upon the bulk nature of the entry and the nature of the itemized tasks.

10.     June 24, 2015: Reduction of total time spent on all itemized tasks for this date from "4.70" to "4.50" based upon the bulk nature of the entry and the nature of the itemized tasks.

11.     June 25, 2015: Reduction of total time spent on all itemized tasks for this date from "6.30" to "6.00" based upon the bulk nature of the entry and the nature of the itemized tasks.

12.     October 7, 2015: Reduction of total time spent on all itemized tasks for this date from "5.70" to "5.25" based upon the bulk nature of the entry and the nature of the itemized tasks.

13. <u>October 15, 2015</u>: Reduction of total time spent on all itemized tasks for this date from "4.90" to "4.50" based upon the bulk nature of the entry and the nature of the itemized tasks.

14. <u>November 24–29, 2015</u>: Reduction of total time spent on "Preparation of Reply Brief" from "15.80" to "14.00" based upon the time reasonably expected to be expended, given the nature of the itemized tasks.

\*     \*     \*

### 3.   <u>Mr. Russo's Timeliness Objection As To The Union's Rule 54 Motion Is Again Rejected For Reasons Of Judicial Economy And Avoidance Of Piecemeal Appeals.</u>

Lastly, Mr. Russo also renews an objection he made to the Union's Rule 54 Motion, namely that the Motion was untimely because the Court had not yet entered final judgment in favor of the Union at the time it took up the Union's Rule 54 Motion. Citing obvious concerns of judicial economy, the Court fully dismissed this exact objection in its December 29, 2015 Memorandum.[87] Nevertheless, the Court will reemphasize what it previously has stated on the issue of timeliness of the Union's Rule 54 Motion.

The simple choice this Court faced, given Mr. Russo's clearly expressed intent to appeal its decision to the Third Circuit, was one between a single appeal and a piecemeal approach involving up to three distinct sources of appellate jurisdiction, one each for this Court's Summary Judgment, Rule 11, and Rule 54

---

[87] ECF No. 62 at 15.

decisions. In order to conserve judicial resources and in line with Third Circuit

precedent on the matter, I deemed it most efficient to address all three motions

simultaneously and defer entry of final judgment. In my December 29, 2015

Memorandum, I explained as follows:

> [C]onsiderations of judicial economy and the particularized posture of
> this case both support disposition of the Rule 54 Motion for Fees at
> this time, concurrently with PPL's Motion for Rule 11 Sanctions.
> Furthermore, the Court finds that it would otherwise strain the
> purpose of Rule 54 to refuse to resolve the Union's Motion for Fees
> now, as final judgment would have already been entered but for the
> need to withhold it pending disposition of all related Rule 11 claims
> . . . . There is no reason why the Court should not take up both
> the Rule 11 Motion and the Motion for Fees simultaneously rather
> than dismissing one without prejudice only to be filed soon thereafter
> to satisfy a mere formality.[88]

Thus, considering for another time these significant concerns as they

relate to judicial economy and avoidance of piecemeal appeals for three

motions springing from identical facts, in conjunction with the preference of

the Third Circuit to avoid unnecessarily segmented review, I would again

find that it was proper to dispose of the Union's Rule 54 Motion at the same

time as PPL's Rule 11 Motion but before entering final judgment.

### 4. Applying The Principles Set Forth In The Third Circuit's Doering Decision, Mr. Russo's Egregious, Repeated Rule 11 Violations And The Clear The Need For Adequate Deterrence, Preclude Any Significant Additional Mitigation.

Before concluding my discussion of the appropriate fee award necessary to

---

[88] ECF No. 62 at 15.

deter Mr. Russo from engaging in future Rule 11 violations, I must consider, as directed nearly thirty years ago by the Honorable A. Leon Higginbotham, Jr., of the Third Circuit, the mitigating factors set forth in <u>Doering v. Union County Board of Chosen Freeholders</u>.[89] Among those considerations, the <u>Doering</u> court noted that "[a] particularly relevant equitable factor is the sanctioned party's ability to pay."[90] As the court explained, "the deterrent effect of an award of attorney's fees depends on the extent of the sanctioned party's resources."[91]

While this Court has considered <u>Doering's</u> instructions, I refuse to extend that case so far as Mr. Russo would stretch it—essentially carving a permanent, judge-made safe harbor for sole practitioners who violate Rule 11. The main teaching this Court discerns from <u>Doering</u> is one requiring temperate, deliberate fact-gathering on the part of the district court so that hasty imposition of "punitive" sanctions does not inadvertently "drive the sanctioned party out of practice."[92] The <u>Doering</u> decision does not bar imposition of fee awards on repeat Rule 11 offenders, it merely requires that when such awards are levied, they must be calculated and thoroughly considered.

Moreover, generalized notions of hardship befalling a sole practitioner like Mr. Russo are insufficient to negate a fee award under <u>Doering</u>. The <u>Doering</u> case

---

[89]  857 F.2d 191, 195 (3d Cir. 1988).
[90]  <u>Id.</u>
[91]  <u>Id.</u> at 196.
[92]  <u>Id.</u>

involved an attorney who allegedly reported less than $40,000 gross annual income on his prior year tax return.[93] In that vein, Judge Higginbotham instructed that district courts should attempt to develop such a record in order to facilitate its mitigation decision.[94] Here, Mr. Russo was given the opportunity to present mitigating arguments and accompanying financial information to the Court on at least four separate occasions: in his Rule 11 and Rule 54 briefs, at the Court's sanctions hearing, and in his supplemental sanctions brief submitted in response to the Defendants' itemized fee bills. At no juncture did Mr. Russo offer or was the Court able to discern any specific details or supporting documents as to whether Mr. Russo would suffer a financial hardship as a consequence of the imposition of attorney's fees. The type of harm against which <u>Doering</u> warns necessarily requires some scintilla of financial proof before it results in reduction of a fee award. The best Mr. Russo could offer here is that the Court should consider "his ability to pay" because he is a "solo practitioner" with "a modest practice."[95] None of those vague statements give the Court reason to mitigate its fee award.

Somewhat unclearly, <u>Doering</u> also enumerates two other equitable factors for a district court's consideration. It states:

> Finally, the district court, on remand, must consider two other specific mitigating factors when it fashions a Rule 11 sanction against [the

---

[93]   <u>Id.</u>
[94]   <u>See</u> <u>id.</u>
[95]   ECF No. 67 at 4. Tr. of Oct. 29, 2015 Sanctions Hearing at 30:15–20.

35

offending lawyer]. First in that regard, it must consider the fact that he has already been subject to adverse press scrutiny as a result of the sanction by the district court. Secondly it must consider the fact that he has been subject to at least one other disciplinary action.[96]

It is not evident to this Court why <u>Doering</u> considers a previous disciplinary action to be a mitigating, rather than aggravating, factor in the Rule 11 setting. Nevertheless, read in context, the Court understands <u>Doering</u> to be referring to at least one other disciplinary action aimed at the same conduct in the same case, given that the plaintiff's lawyer in <u>Doering</u> was deemed to owe fees under both 42 U.S.C. § 1988 as well as under Rule 11. Such is not the case here. Rather, Mr. Russo has engaged in a second and successive violation of Rule 11 in a now distinct action from that before Judge Mariani, highly suggestive in this Court's view, of minimal regard for the consequences of his actions. Because Mr. Russo has not yet been sanctioned in the form of a monetary award in this particular matter, there is no need to mitigate the awards under that <u>Doering</u> factor.

Finally, the Court recognizes that, as in <u>Doering</u>, Mr. Russo may have suffered "adverse press scrutiny" as a result of his Rule 11 sanction. Such scrutiny is nebulous to quantify, and Mr. Russo has made no such estimation during the Court's hearing or in his responsive papers. As such, I will liberally assume that adverse press scrutiny has cost Mr. Russo $1,000 in new business. Accordingly, I will reduce both Defendants' awards by $500.00 each.

---

[96] <u>Id.</u> at 196.

It is the view of the Court that the progression of this case, like so many of Mr. Russo's cases, has borne a consistent theme, and that theme is "Enough is enough." As the Court reads the <u>Doering</u> decision, it is evident that the safeguards it puts in place are meant to protect against unchecked imposition of excessive fee awards that could drive innocuous, first-time offenders out of practice. <u>Doering</u> is not a decision that is meant to forever protect repeat offenders like Mr. Russo from the reach of the Court. <u>Doering</u> does not furnish sole practitioners like Mr. Russo a free pass to engage in such conduct or to bully the defense into submission with manufactured allegations that enjoy no basis in fact. Quite the contrary, <u>Doering</u> accords with the harsh reality of this dispute: It is time that someone put an end to Mr. Russo's vexatious behavior.

<u>Doering</u>, at heart, is a Rule 11 decision that concerns itself with deterrence, even if that deterrence must be measured in light of all the circumstances. As Judge Higginbotham wrote, the hallmark task of a district court when disposing of a Rule 11 or related motion is "to do justice in the particular case," keeping in mind that the core purpose of Rule 11 is "to discourage plaintiffs from bringing baseless actions or making frivolous motions."[97] "Where a district court decides to award a monetary sanction, such as attorney's fees, the total amount of such a sanction . . .

---

[97] <u>Id.</u> at 193–94.

should be guided by equitable considerations."[98]

The equitable considerations in this case weigh decidedly against Mr. Russo. Mr. Russo filed his groundless opposition briefs to Defendants' Summary Judgment Motions in this case just one week after he was sanctioned in the form of public reprimand by Judge Mariani of this Court for similarly baseless allegations in a nearly identical matter.[99] Since that time, Mr. Russo was also sanctioned on public reprimand by The Disciplinary Board of the Supreme Court of Pennsylvania.[100]

Ultimately, it is the judgment of this Court that an award of attorney's in the amount calculated herein is the least severe sanction necessary to thwart Mr. Russo's consistently problematic track record. That final calculation is delineated below.

### 5.   Considering All Equitable Factors And Line-By-Line Reductions Discussed Above, The Final Amount Of The Applicable Fee Awards Are $57,958.59 For PPL And $57,958.96 For The Union.

In conclusion and considering all of the above factors, PPL's fees are reduced by 0.50 hours for Mr. Buckley, 1.00 hours for Mr. Hoffman, 18.40 hours for Mr. Easterly (all billed after Mr. Easterly was named a partner), and 1.40 hours for Ms. Cecala. The $500.00 adverse press mitigation factor from Doering is

---

[98] Id. at 195.

[99] Moore v. Air Methods, Inc., No. 3:14-CV-0684, 2015 WL 4590988, at *1 (M.D. Pa. July 29, 2015).

[100] No. 111 DB 2015.

subtracted. The final fee award for PPL is $57,958.59.

| Table 3. PPL's Final Adjusted Fee and Cost Award Calculation | | | |
|---|---|---|---|
| **Timekeeper** | **Rate** | **Hours** | **Total** |
| Steven E. Hoffman, Esq. | $275.00 | 93.10 | $25,602.50 |
| Edward J. Easterly, Esq. (Partner Rate) | $275.00 | 89.20 | $24,530.00 |
| Edward J. Easterly, Esq. (Associate Rate) | $175.00 | 29.00 | $,5075.00 |
| John J. Buckley, III, Esq. | $175.00 | 8.10 | $1,417.50 |
| Connie Cecala | $90.00 | 4.60 | $414.00 |
| Costs | | | $1,419.59 |
| Adverse Press Mitigation | | | ($500.00) |
| | | **Total** | **$57,958.59** |

The Union's fees are reduced by 12.50 hours for Mr. Q. Taglioli. The $500.00 adverse press mitigation factor from <u>Doering</u> is subtracted. The final fee award for the Union is $57,958.96.

| Table 4. Local 1600's Final Adjusted Fee and Cost Award Calculation | | | |
|---|---|---|---|
| **Timekeeper** | **Rate** | **Hours** | **Total** |
| Quintes D. Taglioli, Esq. | $275.00 | 202.60 | $55,715.00 |
| Daniel E. Taglioli, Esq. | $185.00 | 5.00 | $925.00 |
| Costs | | | $1,818.96 |
| Adverse Press Mitigation | | | ($500.00) |
| | | **Total** | **$57,958.96** |

## IV.   CONCLUSION

The efficient functioning of our judicial cannot permit Mr. Russo to file a third, fourth, or fifth baseless action before his conduct is set straight. Any other outcome would permit him a slap on the wrist and signal to future defendants that battling such meritless lawsuits is an unfortunate cost of doing business—a cost that in so many ways necessarily makes its way back to the consumer in the form of increased utility rates, product pricing, or municipal taxes. That is not the way in which our judicial system is meant to operate.

For someone whose litigation history has sadly become as checkered as Mr. Russo's, it is time for the federal judiciary to affirm that in fact enough is enough. Based on the Court's detailed review of this matter and of the egregious conduct I have witnessed here, have read about in similar federal cases throughout the state, and have spoken about with my colleagues, it is my opinion that every penny awarded to Defendants is not only appropriate and supported by existing law but is also the least severe sanction necessary to deter Mr. Russo from engaging in subsequent frivolous filings in federal court.

An appropriate Order follows.

BY THE COURT:

/s Matthew W. Brann
Matthew W. Brann
United States District Judge